IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

_____

No. 13-1079

_____

**FILED**

**June 16, 2015**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

DELILAH STEPHENS, M.D.,
Defendant Below, Petitioner

v.

CHARLES RAKES, PERSONAL REPRESENTATIVE
OF THE ESTATE OF GARY RAKES,
Plaintiff Below, Respondent

_____

Appeal from the Circuit Court of Mercer County
The Honorable Omar J. Aboulhosn, Judge
Civil Action No. 11-C-76

AFFIRMED

_____

Submitted: February 25, 2015
Filed: June 16, 2015

Thomas P. Mannion, Esq.               Alex J. Shook, Esq.
Andrew D. Byrd, Esq.                  Andrew G. Meek, Esq.
Mannion & Gray Co., L.P.A.            Hamstead, Williams & Shook, PLLC
Charleston, West Virginia             Morgantown, West Virginia
Counsel for the Petitioner            Counsel for the Respondent

JUSTICE BENJAMIN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "A circuit court's entry of summary judgment is reviewed *de novo*."

*Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

2.      "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

3.      "A party who moves for summary judgment has the burden of showing that there is not genuine issue of fact and any doubt as to the existence of such issue is resolved against the movant for such judgment." Syl. Pt. 6, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

4.      "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. Pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

5.      "When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the

facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party." Syl. Pt. 2, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

6.    "In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved." Syl. Pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983).

7.    "In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous." Syl. Pt. 4, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895).

8.    "'Once a trial judge rules on a motion in limine, that ruling becomes the law of the case unless modified by a subsequent ruling of the court. A trial court is vested

with the exclusive authority to determine when and to what extent an in limine order is to be modified.' Syl. Pt. 4, *Tennant v. Marion Health Care Foundation*, 194 W.Va. 97, 459 S.E.2d 374 (1995)." Syl. Pt. 2, *Adams v. Consol. Rail Corp.*, 214 W.Va. 711, 591 S.E.2d 269 (2003).

9.     "Great latitude is allowed counsel in argument of cases, but counsel must keep within the evidence, not make statements calculated to inflame, prejudice or mislead the jury, nor permit or encourage witnesses to make remarks which would have a tendency to inflame, prejudice or mislead the jury." Syl. Pt. 2, *State v. Kennedy*, 162 W.Va. 244, 249 S.E.2d 188 (1978).

10.     "'This court will not consider errors predicated upon the abuse of counsel of the privilege of argument, unless it appears that the complaining party asked for and was refused an instruction to the jury to disregard the improper remarks, and duly excepted to such refusal.' *McCullough v. Clark*, 88 W. Va. 22, 106 S. E. 61, pt. 6, syl." Syl. Pt. 1, *Black v. Peerless Elite Laundry Co.*, 113 W.Va. 828, 169 S.E. 447 (1933).

11.     "An instruction which does not correctly state the law is erroneous and should be refused." Syl. Pt. 2, *State v. Collins*, 154 W. Va. 771, 180 S.E.2d 54 (1971).

12.     "Even if a requested instruction is a correct statement of the law, refusal to grant such instruction is not error when the jury was fully instructed on all principles that applied to the case and the refusal of the instruction in no way impeded the offering side's closing argument or foreclosed the jury's passing on the offering side's basic

iii

theory of the case as developed through the evidence." Syl. Pt. 2, *Shia v. Chvasta*, 180 W.

Va. 510, 377 S.E.2d 644 (1988).

Benjamin, Justice:

The instant action is before the Court upon the appeal of Petitioner Delilah Stephens, M.D., from a September 9, 2013, order of the Circuit Court of Mercer County that denied her motion for judgment as a matter of law, or in the alternative, motion for a new trial, following an adverse jury verdict. Dr. Stephens also appeals orders denying her motions for summary judgment on the amended complaint of Respondent, Charles Rakes (hereinafter "Mr. Rakes"), as personal representative of the Estate of Gary Rakes (hereinafter "the decedent"). Upon review of the parties' arguments, the record before us on appeal, and applicable legal precedent, we affirm the circuit court's orders.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

This medical malpractice action arises from medical treatment received by decedent Gary Rakes at the Bluefield Regional Medical Center ("BRMC") between September 3, 2010, and September 5, 2010. The decedent, who was then sixty-five years old, suffered from several chronic health problems including obstructive sleep apnea, COPD[1], and chronic hypercapnia, a condition which caused him to retain excess carbon dioxide ($CO_2$) in his blood and to become confused and agitated.

---

[1] COPD is an abbreviated term for chronic obstructive pulmonary disease, a condition which blocks airflow making it difficult to breathe. The medical records reflect that the decedent, a coal miner, had occupational pneumoconiosis and a prior history of smoking. He also had a history of congestive heart failure and type 2 diabetes mellitus.

1

According to medical records from October of 2008 and March and June of 2010, the decedent was previously admitted to BRMC with acute respiratory distress caused by excess CO2 retention that caused decreased mental and respiratory function. During his admission in June of 2010, Dr. Stephens was listed as the decedent's attending physician. During the course of that hospital stay, a pulmonologist was consulted to manage the decedent's lung issues, multiple arterial blood gas ("ABG") levels were obtained to monitor his CO2 levels, and he received a bi-level positive airway pressure ("BiPAP") treatment and breathing treatments such as bronchodilators to help him expel excess CO2 from his lungs. The decedent was successfully treated and released. The decedent was given a BiPAP portable ventilator to use at home to treat the condition and help expel CO2 from his blood.

Subsequently, during the early morning hours of September 3, 2010, the decedent presented to BRMC with an exacerbation of the same chronic lung problems for which he had been treated during his June 2010 visit. Dr. Stephens was again listed as attending physician. The Admission History and Physical of September 3, 2010, noted that his allergies included Seroquel, Ativan, and Aldactone.[2] However, the decedent was

---

[2] Seroquel is an anti-psychotic sedative. During a previous hospitalization, the decedent became excessively sedated when he was given 50 mg of Seroquel, and was therefore determined to have an adverse reaction to the medication. Sedation was hazardous to his lung function and mental function, so Seroquel was appropriately classified as an "allergy" or adverse drug reaction.

given two different anti-psychotic sedatives during his admission because of his confusion and altered mental state.[3] He was first given 5 mg of Haldol on September 3, 2010, which was ordered by Dr. Jorieth Jose, the admitting intern. Dr. Stephens consulted with Dr. Jose regarding the administration of this medication. According to the record, the Haldol did not appear to effectively sedate the decedent. Approximately two hours later, Dr. Toni Muncy, the chief resident, ordered that the decedent be given 100 mg of Seroquel, even though his admitting records noted the prior adverse reaction to this drug. Shortly after the administration of Seroquel, the decedent became more disoriented, agitated, and combative. The record reflects that he refused to wear his oxygen mask and stay in his room. The decedent was then placed flat on his back in soft wrist restraints. He subsequently became "quite sedated," resting quietly. The medical records indicate that Dr. Stephens signed off on Dr. Muncy's order for the administration of Seroquel and took no further action.[4]

---

[3] The death summary notes that the decedent was reportedly having episodes of acute delirium with hallucinations.

[4] Although the record is clear that Dr. Stephens did not personally order the Seroquel for the decedent, the medical records indicate that Dr. Stephens subsequently signed off on Dr. Muncy's order for its administration. As discussed further below, Mr. Rakes alleges that Dr. Stephens' signature on Dr. Muncy's order demonstrates that she was aware that Seroquel had been administered to the decedent. Mr. Rakes contends that although Dr. Stephens was aware of the decedent's previous adverse reaction to the drug, she took no countermeasures once she became aware that Seroquel had been administered to the decedent.

On September 4, 2010, a neurological consult by Dr. Khalid Razzaq was ordered due to the decedent's altered mental status.[5] Dr. Razzaq ordered that the decedent be administered 25 mg of Seroquel that afternoon. The decedent remained sedated most of the day and night of September 4, 2010, and never fully awakened.[6] He also remained in wrist restraints lying flat on his back during this time. Although the decedent's initial ABG's revealed that he had excessively high $CO_2$ levels in his blood, no follow-up ABG studies were ordered to continue to monitor his $CO_2$ levels once he was admitted. The record further reflects that a pulmonologist was not consulted at any point during the decedent's admission. Additionally, although the decedent required a BiPAP when he slept, the record reveals that a BiPAP was not ordered until 10:00 pm on September 4, 2010, despite the fact that he was heavily sedated during the course of his hospital stay. During the early morning hours of September 5, 2010, the decedent developed tachyarrhythmia, QRS widening, bradycardia, and asystole. He died at 7:00 am.

On the death certificate, Dr. Stephens wrote that the decedent died as a result of "Acute on Chronic Hypercapnic Respiratory Failure due to or as a consequence

---

[5] The plan of care agreed upon by Dr. Jose, Dr. Stephens, and Dr. Greenstein, the senior attending resident, was to consult neurology, obtain a urine drug screen, and a serum ammonia level. Dr. Greenstein ordered a CT scan of the decedent's head as well.

[6] The death summary indicates that the decedent was arousable only to tactile stimuli, and had to be awakened to be given the dose of Seroquel ordered by Dr. Razzaq.

4

of Adverse Drug Reaction to Seroquel." Dr. Stephens wrote in the Death Summary that the decedent had not been using a BiPAP at the hospital because the proper settings were unknown, and that the decedent was sedated most of the night and most of the day on September 4, 2010.

Following the decedent's death, his family filed the instant medical malpractice action alleging that Dr. Stephens, Dr. Razzaq, Dr. Muncy and other employees of Health Services of the Virginias Inc. deviated from the standard of care by prescribing and administering excessive doses of Haldol and Seroquel to the decedent, ignoring documented allergies, contraindications, and black box label warnings, and by willfully and recklessly failing to take any measure to investigate or rectify the reasons for his prolonged state of unconsciousness, proximately causing his death. As discussed in further detail below, Mr. Rakes alleged that Dr. Stephens became aware that the decedent had been given Seroquel by Dr. Toni Muncy and Dr. Khalid Razzaq, but failed to take any countermeasures. Mr. Rakes also alleged that Dr. Stephens ordered, or was at least aware that, the decedent was administered Haldol, a drug that was contraindicated given his condition, by Dr. Jorieth Jose, the admitting intern.

In his deposition testimony, Mr. Rakes' expert witness, Dr. Kenneth Scissors[7], opined that the decedent's proximate cause of death was ventilator failure

---

[7] Dr. Scissors is an experienced practicing hospitalist and internist.

resulting from the "excessive administration of the sedatives Haldol and Seroquel in the setting of underlying chronic lung disease." Dr. Scissors opined that Dr. Stephens deviated from the standard of care that she herself helped to establish for the decedent at BRMC given his prior admissions there; that Dr. Stephens should have ordered breathing treatments for the decedent's respiratory problems when he was admitted on September 3, 2010; that Dr. Stephens failed to timely order adequate CPAP or BiPAP treatment on September 3, 2010, and during the day of September 4, 2010; that Dr. Stephens failed to provide appropriate BiPAP settings for when the order was actually made on the night of September 4, 2010; that Dr. Stephens failed to follow the decedent's ventilator status with repeat ABG's after the initial test indicated acute and chronic $CO_2$ retention with acute and chronic respiratory acidosis; that Dr. Stephens ordered 5mg of Haldol, a very high dose, for the decedent in the setting of known acute and chronic $CO_2$ retention without providing ventilator support and ABG monitoring; that Dr. Stephens permitted the decedent to remain heavily sedated in an obtunded state even after she examined him on September 4, 2010; that Dr. Stephens failed to consult with a pulmonary specialist to address the decedent's severe acute and chronic pulmonary disorders and provide appropriate ventilator support and monitoring measures; and therefore, Dr. Stephens acted recklessly. According to Dr. Scissors, the decedent's prolonged sedated state caused by Seroquel and Haldol, the failure to repeat the ABG test to monitor his $CO_2$ levels, the failure to obtain a pulmonologist consult, and the failure to timely administer appropriate BiPAP caused the decedent's death.

Mr. Rakes' expert pulmonologist, Dr. Jeffrey Schwartz, testified that the decedent should have been on BiPAP when he was admitted; that Dr. Stephens could have checked prior records to determine the appropriate BiPAP settings for the decedent; that a pulmonologist could have helped to determine the appropriate BiPAP settings if one had been consulted; and that Dr. Stephens' deviation from the standard of care caused the decedent's death.

Following discovery, Dr. Stephens filed two motions for summary judgment: one regarding proximate causation and one regarding punitive damages. In her first motion for summary judgment, Dr. Stephens argued that her actions did not proximately cause the decedent's death. To the extent that the circuit court did not grant Dr. Stephens' motion for summary judgment on the entire amended complaint, she filed a subsequent motion for summary judgment on Mr. Rakes' punitive damages claim. Subsequent to the close of discovery, the parties filed numerous motions *in limine*. Dr. Stephens filed a motion *in limine* to preclude any testimony that she ordered and administered Seroquel to the decedent and that the order and administration of Haldol alone was the cause of the decedent's death. On the first day of trial, the circuit court entered an order denying Dr. Stephens' motions for summary judgment and granting Dr. Stephens' motion *in limine* precluding any testimony that she ordered and administered Seroquel to the decedent and that the order and administration of Haldol alone was the cause of the decedent's death.

7

Following a three day jury trial, the jury awarded Mr. Rakes $500,000.00 in non-economic damages, and $500,000.00 in punitive damages. A judgment order in the amount of $810,000.00 was entered, which encompassed an off-set for all pre-verdict settlements from the jury's non-economic damage award.[8] Dr. Stephens timely filed a renewed motion for judgment as a matter of law, or in the alternative, motion for new trial alleging that there was insufficient evidence to support the jury's verdict against her and to support the punitive damages award, and that numerous prejudicial errors occurred during the trial. The substance of the arguments contained in Dr. Stephens' post-trial motions is discussed in greater detail below. Following a post-trial motions hearing, the circuit court entered an order on September 9, 2013, denying Dr. Stephens' renewed motion for judgment as a matter of law, or in the alternative, motion for a new trial, finding that there was enough evidence to justify the jury's verdict as well as the award for punitive damages, and that no prejudicial error had occurred.

On appeal, Dr. Stephens asserts the following assignments of error seeking reversal: 1) the circuit court erred in denying Dr. Stephens' motions for summary judgment on Mr. Rakes' amended complaint regarding proximate causation and punitive damages; and 2) for various reasons outlined below, the circuit court erred in denying Dr.

---

[8] Dr. Muncy, Dr. Razzaq, and Health Services of the Virginias, Inc. settled with Mr. Rakes prior to trial.

Stephens' renewed motion for judgment as a matter of law, or in the alternative, motion for new trial.

## II.

## STANDARD OF REVIEW

The circuit court denied Dr. Stephens' motions for summary judgment with regard to liability and punitive damages. "A circuit court's entry of summary judgment is reviewed *de novo*." *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). Additionally, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. Of N.Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963). Furthermore, "[a] party who moves for summary judgment has the burden of showing that there is not genuine issue of fact and any doubt as to the existence of such issue is resolved against the movant for such judgment." *Id*. at Syl. Pt. 6.

Additionally, the circuit court denied Dr. Stephens' renewed motion for judgment as a matter of law and motion for new trial. "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. Pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009). This Court has also stated that when it

9

reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

*Id*. at Syl. Pt. 2.

Finally, this Court has stated "[w]e review the rulings of the circuit court concerning a new trial and its conclusions as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." *Tennant v. Marion Health Care Foundation*, 194 W. Va. 97, 104, 459 S.E.2d 374, 381 (1995).

## III.

## ANALYSIS

### A.  *Motion for Summary Judgment Regarding Proximate Causation*

In her first assignment of error, Dr. Stephens alleges that the circuit court erred in denying her motion for summary judgment because there were no genuine issues of material fact as to whether her actions proximately caused the decedent's death.  Dr. Stephens alleges that although Mr. Rakes' expert, Dr. Scissors, opined that the proximate cause of death was a result of the excessive administration of the sedatives Haldol and

Seroquel in the setting of the decedent's underlying chronic lung disease, Dr. Stephens did not order Seroquel for the decedent. Rather, it was ordered by Dr. Toni Muncy (100 mg), who did not consult with Dr. Stephens beforehand. Another physician, Dr. Razzaq, also ordered Seroquel (25 mg) but, like Dr. Muncy, failed to consult with Dr. Stephens before doing so.

Dr. Stephens asserts that in his deposition, Dr. Scissors testified that he preferred Haldol over Seroquel because it is simpler and more straightforward to use; that he does not believe Haldol had a sedative effect on the decedent, and therefore, it would not have had a clinically significant impact on the decedent's respiratory function; and that Haldol was out of the decedent's system at the time of death. Dr. Stephens also asserts that although Dr. Scissors opined that she deviated from the standard of care by not ordering adequate or timely CPAP or BiPAP, Dr. Schwartz, Mr. Rakes' expert pulmonologist, opined that if appropriate BiPAP therapy had been administered at 9:00 pm or 10:00 pm on September 4, 2010, as Dr. Stephens ordered, the decedent would have survived.[9]

---

[9] As discussed further below, the parties dispute whether Dr. Stephens' BiPAP order was appropriate, because Mr. Rakes' experts contend that the correct settings were not ordered. Mr. Rakes takes issue with Dr. Stephens' characterization of Dr. Schwartz's testimony in this regard.

In response, Mr. Rakes contends that there were genuine issues of fact regarding the proximate cause of the decedent's death and that the matter was properly tried before a jury. Mr. Rakes asserts that as the attending hospitalist in charge of the decedent's medical care, Dr. Stephens deviated from the standard of care in the following respects: 1) she failed to order follow-up ABG test after $CO_2$ levels were revealed to be at dangerous levels upon presentment to emergency department and admission to BRMC; 2) after the decedent's admission, she failed to order BiPAP to help with ventilatory assistance until the following night and the BiPAP setting was incorrect when ordered; 3) she failed to follow up after BiPAP was finally ordered to see if it was carried out; 4) she failed to take any countermeasures after learning the decedent was given Seroquel, a drug to which he was known to be allergic; 5) she failed to consult with the decedent's pulmonologist even though during the decedent's previous admissions to BRMC, the pulmonologist helped to provide him with proper ventilator assistance; 6) she failed to consult with the decedent's pulmonologist when she did not know the decedent's BiPAP settings; and 7) she failed to treat the decedent for his chronic pulmonary disease, which was the reason he was admitted to the hospital in the first place.

Mr. Rakes contends that Dr. Stephens mischaracterizes Dr. Schwartz's testimony by stating that if the decedent had received the BiPAP that Dr. Stephens ordered, then he would have survived. In response to the question regarding when BiPAP therapy would have been too late to save the decedent, Dr. Schwartz testified:

12

Well, bizarrely, it was ordered for the night of the 4th. It was ordered QHS, which is evening. But he did not die until the following morning. And I do believe that 9:00 or 10:00 pm, if he would have gotten *appropriate* BiPAP therapy, he may have well survived.

. . . .

Q. I don't think you said that it was too late, I think you testified that if the BiPAP order would have been followed, that—to a reasonable degree of medical certainty, that in likelihood he would have survived.

A. *If it was ordered differently*. I don't like the way it was set up in terms of the orders. I'm critical of that, as I've said. . . . he needed measurements of his carbon dioxide level as time went on. So there was a BiPAP order to start that night. There was no measures [sic] or orders for arterial blood gases to monitor his carbon dioxide. All the time he's sedated and sleepy and hard to arose [sic] and has worsened mental status, they don't check his carbon dioxide level. So had BiPAP been used correctly, even on the evening of the 4th, he likely would have survived, *but that order—and in the context of all the other orders that were not there, was too little too late.*

(Emphasis added).

Dr. Schwartz further opined that, as the admitting doctor, Dr. Stephens should have ordered BiPAP as part of the decedent's admitting orders and further, that Dr. Schwartz "would have used different settings than what he was set on, which I think were incorrect. So his pressure settings I was in disagreement with, and obviously the timing as I already addressed." Dr. Schwartz also opined that

[h]e should have had the therapy when he got admitted 24 hours a day, with monitoring of his carbon dioxide level. His carbon dioxide level was extremely elevated. That was the likely cause of his abnormal mental status when he came in. And the treatment of that was straightforward, which is to use BiPAP at the time of his hospitalization for acute decompensation.

13

When asked about additional criticisms of Dr. Stephens, Dr. Schwartz said:

> So he got sedated when he shouldn't. He didn't get a bedside sitter to control his agitation if that was deemed necessary. He didn't get BiPAP when he needed it. He didn't get carbon dioxide levels measured and followed up. He didn't get a pulmonary consult. He didn't get any treatment for his COPD once he left the emergency room. He didn't get any of the care that he received on previous hospitalizations for respiratory failure. So this was as bad a care as I've ever seen in my 30 years in a three-day hospitalization.

In her reply, Dr. Stephens argues that Mr. Rakes' attempt to place liability on Dr. Stephens by virtue of her status as the attending physician/hospitalist is based upon the "captain of the ship" doctrine, which was rejected by this Court in *Thomas v. Raleigh General Hospital*, 178 W.Va. 138, 358 S.E.2d 222 (1987).[10] Dr. Stephens asserts that it is undisputed that she did not order Seroquel and that it was Dr. Muncy who gave the order to Nurse Laura Potter for 100 mg to be administered to the decedent. Dr. Muncy was not a part of Dr. Stephens' team and did not consult with her before ordering Seroquel. Likewise, Dr. Stephens contends that Dr. Razzaq ordered Nurse Larry Rose to give the decedent 25 mg of Seroquel the following day, and that Dr. Razzaq did not consult with her before ordering the Seroquel. She argues that under West Virginia law,

---

[10] In *Thomas*, this Court rejected the "captain of the ship" concept that liability should be imposed by virtue of the surgeon's status and without any showing of actual control by the surgeon, explaining that there are situations where surgeons do not always have the right to control all personnel within the operating room. *Id*. at 141, 358 S.E.2d at 225.

she cannot be held liable for the conduct of other medical professionals over whom she had no control.

Additionally, Dr. Stephens contends that Mr. Rakes' assertion that she proximately caused the decedent's death by failing to order "appropriate" BiPAP therapy is an improper representation of Dr. Schwartz's testimony. Dr. Stephens contends that Dr. Schwartz testified that even though she did not order the correct BiPAP settings, BiPAP adjustments and carbon dioxide measurements would have been a follow-up step after the administration of the BiPAP.

Upon review of all the expert reports and testimony presented, we conclude that there was a genuine issue of fact regarding the proximate cause of the decedent's death necessitating a denial of summary judgment. "A plaintiff's burden of proof is to show that a Petitioner's breach of a particular duty of care was a proximate cause of the plaintiff's injury, not the sole proximate cause." *Mays v. Chang*, 213 W.Va. 220, 224, 579 S.E.2d 561, 565 (2003). As we stated in syllabus point 2 of *Everly v. Columbia Gas of West Virginia, Inc.*, 171 W.Va. 534, 301 S.E.2d 165 (1982), "[a] party in a tort action is not required to prove that the negligence of one sought to be charged with an injury was the sole proximate cause of an injury."

Although Dr. Stephens argues that her actions were not the sole proximate cause of the decedent's death because she did not personally order the Seroquel and did

not fail to administer BiPAP on the night of September 4, 2010, we find that there was testimony, as discussed in detail above, creating a genuine issue of material fact that she deviated from the standard of care in several respects, proximately causing the decedent's death. The criticisms offered by Mr. Rakes' experts do not seek to hold Dr. Stephens liable as "captain of the ship" for the actions of other doctors or nurses. Rather, these are criticisms of Dr. Stephens' own deviations from the standard of care expected of an attending hospitalist treating a patient in the decedent's situation.

Furthermore, although Dr. Stephens attempts to mischaracterize Dr. Schwartz's testimony by arguing that he opined that "if BiPAP was administrated at 9:00 pm or 10:00 pm on September 4, 2010, *as ordered by Dr. Stephens*, the decedent would have survived," or that "BiPAP adjustments and carbon dioxide measurements would have been a follow-up step after the administration of the BiPAP," the record is abundantly clear that Dr. Schwartz was critical of Dr. Stephens' care in this regard. (Emphasis added). Again, when asked about this issue, Dr. Schwartz unequivocally stated,

> Q. I don't think you said that it was too late, I think you testified that if the BiPAP order would have been followed, that—to a reasonable degree of medical certainty, that in likelihood he would have survived.
>
> A. *If it was ordered differently. I don't like the way it was set up in terms of the orders. I'm critical of that, as I've said.* . . . he needed measurements of his carbon dioxide level as time went on. So there was a BiPAP order to start that night. There was no measures [sic] or orders for arterial blood gases to monitor his carbon dioxide. All the time he's

16

sedated and sleepy and hard to arose [sic] and has worsened mental status, they don't check his carbon dioxide level. *So had BiPAP been used correctly, even on the evening of the 4th, he likely would have survived, but that order—and in the context of all the other orders that were not there, was too little too late.*

(Emphasis added). Based upon all of the foregoing, we conclude that the circuit court's order denying Dr. Stephens' motion for summary judgment on the issue of proximate causation should be affirmed.

### B. Motion for Summary Judgment Regarding Punitive Damages

Second, Dr. Stephens asserts that the circuit court erred in denying her motion for summary judgment regarding Mr. Rakes' claim for punitive damages. Dr. Stephens argues that an award of punitive damages requires proof of "gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others." *Workman v. UA Theatre Circuit, Inc.*, 84 F.Supp.2d 790, 793 (S.D.W.Va. 2000) (*citing Alkire v. First Nat. Bank of Parsons*, 197 W.Va. 122, 129, 475 S.E.2d 122, 129 (1996)). Furthermore, "[a] wrongful act, done under a bona fide claim of right, and without malice in any form, constitutes no basis for such damages." *Jarvis v. Modern Woodmen of Am.*, 185 W.Va. 305, 311, 406 S.E.2d 736, 742 (1991) (citations omitted).

Mr. Rakes alleged in his amended complaint that Dr. Stephens and the other named defendants willfully and recklessly ignored documented allergies,

17

contraindications, and black box warnings; willfully and recklessly provided excessive doses of Haldol and Seroquel; and willfully and recklessly failed to take any measure to investigate or rectify the reasons for the decedent's prolonged state of unconsciousness as to evince a conscious disregard for the decedent's rights. Dr. Stephens asserts that the evidence did not support these allegations because it is undisputed that she noted on the decedent's medical records his allergy to Seroquel, a fact she did not ignore. Rather, it was Drs. Razzaq and Muncy who ordered Seroquel, not Dr. Stephens. Dr. Stephens also contends that she ordered BiPAP therapy the night before the decedent died but her order was not followed. She maintains that Mr. Rakes' own expert testified that had Dr. Stephens' order been followed, the decedent would have survived. Thus, she asserts that there was no issue of material fact regarding punitive damages because Mr. Rakes failed to show more than a slight, at best, deviation from the applicable standard of care on the part of Dr. Stephens. She contends that this was a case of simple negligence damages and punitive damages are not available under such a theory. She contends that summary judgment should have been granted on the punitive damages claim.

In response, Mr. Rakes avers that summary judgment was properly denied on this issue because there were genuine issues of material fact that Dr. Stephens acted recklessly in her care of the decedent. Mr. Rakes contends that in West Virginia, proving a defendant's actions were reckless is sufficient for an award of punitive damages. *Workman v. UA Theatre Circuit, Inc.*, 84 F.Supp.2d 790. He additionally maintains that "the punitive damages definition of malice has grown to include not only mean spirited

18

conduct, but also extremely negligent conduct that is likely to cause serious harm." *TXO Prod. Corp. v. Alliance Res. Corp.*, 187 W.Va. 457, 474, 419 S.E.2d 870, 887 (1992). Furthermore, wanton negligence is a "[r]eckless indifference to the consequences of an act or omission, where the party acting or failing to act is conscious of his conduct and, without any actual intent to injure, is aware, from his knowledge of existing circumstances and conditions, that his conduct will inevitably or probably result in injury to another." *Stone v. Rudolph*, 127 W.Va. 335, 345, 32 S.E.2d 742, 748 (1944).

In response to Dr. Stephens' motion for summary judgment, Mr. Rakes provided evidence that Dr. Stephens' care of the decedent was "dangerous and, at the very least, reckless." In addition to setting forth various criticisms of Dr. Stephens' actions, or inactions, regarding the decedent's medical care (which were discussed more thoroughly above), Dr. Schwartz's testimony sufficiently established Dr. Stephens' wanton negligence and reckless conduct:

> So he got sedated when he shouldn't. He didn't get a bedside sitter to control his agitation if that was deemed necessary. He didn't get BiPAP when he needed it. He didn't get carbon dioxide levels measured and followed up. He didn't get a pulmonary consult. He didn't get any treatment for his COPD once he left the emergency room. He didn't get any of the care that he received on previous hospitalizations for respiratory failure. So this was as bad a care as I've ever seen in my 30 years in a three-day hospitalization.

Furthermore, Dr. Scissors testified at trial that allowing a patient such as the decedent to remain sedated, placed in wrist restraints, and laid flat on his back with no ventilatory support was more than dangerous; this was "reckless."

19

Upon review of all of the evidence presented at trial, we conclude that there was sufficient testimony presented for a jury to be convinced that willful, wanton and reckless conduct occurred warranting punitive damages under *TXO Prod. Corp. v. Alliance Res. Corp.*, 187 W.Va. at 474, 419 S.E.2d at 887. Accordingly, we conclude that the circuit court did not err in denying Dr. Stephens' motion for summary judgment on Mr. Rakes' punitive damages claim.

### C. Renewed Motion for Judgment as a Matter of Law

At the close of both parties' case-in-chief, Dr. Stephens moved for judgment as a matter of law under Rule 50(a) of the *West Virginia Rules of Civil Procedure* on the issues of liability and punitive damages. Dr. Stephens argued that Mr. Rakes failed to establish proximate causation because the evidence at trial pointed to intervening/superseding causation, and that the evidence presented failed to sustain a claim for punitive damages. Both motions were denied by the circuit court. Following trial, Dr. Stephens filed a renewed motion for judgment as a matter of law, or in the alternative motion for a new trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure*. On September 9, 2013, the circuit court entered an order denying Dr. Stephens' motion.

### *Proximate Cause*

In its order denying Dr. Stephens' motion for judgment as a matter of law or in the alternative, motion for new trial, the circuit court found that there was enough

evidence of proximate causation to justify the jury's verdict. The circuit court found that Mr. Rakes proved by a preponderance of the evidence that Dr. Stephens breached her duty of care to the decedent, and as a result of that breach, proximately caused the decedent's demise.

Dr. Stephens appeals the circuit court's order denying her motion for judgment as a matter of law asserting essentially the same arguments that she makes in appealing the circuit court's denial of summary judgment. She asserts that the facts elicited at trial break the causal connection to Mr. Rakes' alleged theory on proximate causation. Ultimately, Dr. Stephens argues that the evidence established that the proximate cause of Gary Rakes' death was out of her control.

This Court has held that

> [w]hen this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the West Virginia Rules of Civil Procedure [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

Syl. Pt. 2, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009). We have also stated that

> [i]n determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the

21

> evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. Pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983).

We conclude that pursuant to the Medical Professional Liability Act ("MPLA"), W. Va. Code § 55-7B-1, *et seq.*, Mr. Rakes provided the necessary elements required in proving that the decedent's death resulted from the failure of Dr. Stephens to follow the accepted standard of care. Specifically, by presenting the extensive expert testimony discussed above, Mr. Rakes proved that Dr. Stephens failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which she belonged acting in the same or similar circumstances, and that such failure was a proximate cause of the injury or death. *See* W. Va. Code § 55-7B-3(a) (2003).

Dr. Stephens mischaracterizes Dr. Schwartz's actual testimony by stating that "Dr. Schwartz testified that had Dr. Stephens' order for BiPAP therapy been carried out, the decedent would have survived." Dr. Stephens argues that because the nurses failed to carry out Dr. Stephens' BiPAP order on the night before he died, she is absolved of any causation due to the "intervening cause." However, our review of the transcript causes us to conclude otherwise. Dr. Schwartz specifically testified that had Dr.

22

Stephens' orders been carried out, they would not have saved the decedent because Dr. Stephens did not order *appropriate* BiPAP therapy settings considering the decedent's critical condition on the night of September 4, 2010.

Both of Mr. Rakes' expert witnesses testified that Dr. Stephens provided such poor care of the decedent by the course of treatment that she chose, that he would have died regardless of whether the BiPAP Dr. Stephens ordered, at incorrect settings, would have been applied a few short hours before his death. Additionally, contrary to her trial testimony, Dr. Stephens noted in the Death Summary that the BiPAP was never applied because the decedent's settings were unknown. There was no mention of any nurse's failure to apply the BiPAP in the Death Summary notes.[11]

Furthermore, Mr. Rakes' experts specifically rebutted Dr. Stephens' claim that the nurses' failure to administer BiPAP therapy was an intervening/superseding cause because they believed the decedent would have died regardless at that point. Therefore, because Mr. Rakes presented evidence in the form of expert testimony stating that Dr. Stephens' deviations from the appropriate standard of care were a proximate cause of the decedent's death, and because all doubts and inferences should be decided in

---

[11] Interestingly, Dr. Stephens noted in the Death Summary that because of the series of events that occurred leading up to the decedent's death, the case possibly needed further review.

favor of the non-moving party, we affirm the circuit court's denial of Dr. Stephens' renewed motion for judgment as a matter of law on this issue.

Punitive Damages

Dr. Stephens also submits that the evidence at trial failed to satisfy any claim for punitive damages. Upon reviewing the evidence in the record, we conclude that the circuit court's denial of Dr. Stephens' renewed motion as a matter of law on the issue of punitive damages should be affirmed because the jury was properly instructed, and Mr. Rakes presented sufficient evidence that Dr. Stephens' care of the decedent was dangerous, and at the very least highly reckless. This Court has held that, "[i]n actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous." Syl. Pt. 4, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895).

Through all of the extensive testimony detailing Dr. Stephens' deviations from the standard of care that proximately caused the decedent's death, both of Mr. Rakes' experts presented sufficient evidence that Dr. Stephens' lack of treatment was dangerous, and even "reckless." The circuit court properly concluded that a prima facie showing warranting punitive damages had been made. The court also concluded that the compensable award was identical to the punitive damages award, which was a reasonable

24

amount for the loss of life. Pursuant to *Mayer v. Frobe,* we conclude that Mr. Rakes was entitled to receive a punitive damage award and affirm the circuit court's ruling on this issue.

### D. Motion for a New Trial

<u>*Batson*</u> <u>Challenge</u>

During the jury selection and voir dire at trial, Mr. Rakes' counsel inquired of the entire jury panel whether any of them had heard of the medical condition COPD. The circuit court noted that almost everyone on the panel and in the audience raised their hand. Upon questioning by Mr. Rakes' counsel, Juror Darago indicated that she was familiar with COPD because her husband, a coal miner for 30 years, had it, and also had black lung. She stated that he got along "pretty well." Juror Kessinger stated that she knew about COPD from working in the medical field and from hearing about it on television. Juror Bish stated that her deceased father had COPD and black lung. Juror Boyer, an African American female, stated that "[she knew] that COPD can come from smoking so many years[;]" she did not know anyone who had COPD from smoking, but she had "seen commercials on TV[;]" and that "you could catch emphysema with it."[12] After Juror Boyer was questioned, Juror Vance, a white male, advised Mr. Rakes' counsel that he had emphysema; that he "was a firefighter in service. My lungs were burned. And, of course, I smoked, too."

---

[12] Emphysema is a common type of COPD.

Thereafter, Mr. Rakes' counsel struck Juror Boyer, the only African American on the jury panel. Dr. Stephens objected and instituted a *Batson* challenge.[13] The following discussion occurred:

> [MR. MANNION]: Your Honor, the plaintiff has moved to strike Juror No. 10, Tracy Boyer. I will note that it's the only African-American on this jury panel to be stricken. We have an African American defendant. There's no basis. Her answers in voir dire were absolutely unbiased, and I'm raising a *Batson* challenge.
>
> [THE COURT]: Mr. Shook?
>
> [MR. SHOOK]: I have complete discretion to use my discretionary strikes as I see fit, if I don't think she's going to be a good juror. It didn't have anything to do with her race or - I hate to raise that point.
>
> [THE COURT]: Under *Batson* you have to have a nondiscriminatory reason to strike her.
>
> [MR. SHOOK]: I didn't like her answers.
>
> [MR. MANNION]: It's not sufficient to say you don't like her answers.
>
> [MR. SHOOK]: We need to go on the record if we're going to make a record on that. I don't understand what the objection is.
>
> [THE COURT]: The objection is pretty clear, Mr. Shook. She is the only African-American that's on the

---

[13] Under *Batson v. Kentucky*, after the objecting party raises its case of discrimination, the striking party must offer a neutral explanation for making the strike. 476 U.S. 79, 97, 106 S.Ct. 1712, 1723 (1986). Finally, the trial court must determine whether the opponent of the strike has carried his burden of proving purposeful discrimination. *Id.*

jury panel, and you have to have a non-discriminatory reason to be able to strike her. You have to be able to articulate that.

[MR. SHOOK]: I didn't think her answers sounded like she would be a good witness for me.

[...]

She just seemed to have a lack of understanding of the questions that I asked to her - a good juror for me, rather. She made references to smoking and causing lung problems, other issues that I think would make her bad juror for my client.

[MR. MANNION]: Your Honor, I don't believe he's set forth a nondiscriminatory basis. It's pretty clear what he's trying to do. She's the only African-American - there have been plenty of people who talked about different conditions that folks have had, and she didn't say anything that would give any reason where she would not be a fair juror [...]

Following a brief recess, the circuit court asked Dr. Stephens' counsel to state his objection again to make the record clear. Dr. Stephens' counsel reiterated his objection, stating,

There was nothing that Ms. Boyer said in any way, shape, or form that would give rise for her being unbiased, or anything of that nature.

I also do not believe that counsel has given a nondiscriminatory reason—he talks about her answers on smoking. She said she saw a commercial on TV on COPD. That's all she said about it. And I hardly think seeing a commercial is a nondiscriminatory reason to get rid of somebody.

[MR. SHOOK]: My recollection of her answers were that she drew a strong connection between smoking and these respiratory issues.

27

There's going to be an issue throughout this trial, and it's mixed in the records, as to whether my client was a smoker or not, which places again a negligence or comparative fault on the part of my client. That was the reason for striking this [juror].

[MR. MANNION]: [N]o one has argued that [the decedent]. . . in any way obtained emphysema or COPD from his smoking. That's not what we're saying. And the records said he hadn't smoked for a while. I don't know how long that was. We're not raising smoking as an issue, and I've already said were not raising any comparative—

The circuit court overruled Dr. Stephens' objection and allowed Juror Boyer to be stricken.

On appeal, Dr. Stephens argues that Mr. Rakes failed to satisfy *Batson*, which requires three elements to be proven: (1) there must be a prima facie case of improper discrimination; (2) if a prima facie case is shown, the striking party must offer a neutral explanation for making the strike; and (3) if a neutral explanation is given, the trial court must determine whether the party opposing the strike has proved purposeful discrimination. *See* Syl. Pt. 3, *Batson*, 476 U.S. 79, 106 S.Ct. 1712. Dr. Stephens argues that Mr. Rakes failed to give a neutral explanation for striking the only African American on the jury panel. Initially, Mr. Rakes' counsel simply stated, "I didn't like her answer." He then put a non-discriminatory reason for the strike on the record: "She just seemed to have a lack of understanding of the questions that I asked to her[;]" "[s]he made references to smoking and causing lung problems "she seemed to have a lack of

28

understanding of the questions[;]" "she drew a strong connection between smoking and these respiratory issues[;]" and "[t]here's going to be an issue throughout this trial . . . as to whether my client was a smoker or not, which places again a negligence or comparative fault on the part of my client."

Dr. Stephens argues that the reasons stated were not valid because there was no evidence suggesting Juror Boyer lacked an understanding of the questions asked of her, nor did she draw a strong connection between smoking and respiratory issues. She simply stated that COPD can come from smoking and that you can "catch" emphysema. She learned this from television commercials, not personal experience. Dr. Stephens also asserts that another white juror, Juror Vance, directly linked smoking to emphysema, a common type of COPD. He revealed that he was a smoker and had emphysema. Juror Vance was not stricken from the jury panel. Finally, Dr. Stephens argues that smoking and/or comparative fault were not being raised as an issue at trial, so this reason for striking Juror Boyer was invalid.

Mr. Rakes responds that the explanation for striking Juror Boyer was sufficient under *Batson*. At trial, there were many medical records stating the decedent was a life-long smoker who had recently quit. There could have been juror bias against smokers who may cause their own poor health conditions. Striking Juror Boyer was consistent with the circuit court's *in limine* ruling, which precluded Dr. Stephens from

informing the jury that the decedent was non-compliant with his BiPAP machine prior to his admission to BRMC, or that he was comparatively negligent for his own death.

Mr. Rakes further contends that in asking the jury panel about their knowledge of COPD, only Juror Boyer displayed a direct connection between smoking and COPD. In contrast, Juror Darago said her husband had COPD and black lung from working in the mines, and Juror Vance stated he has emphysema because his lungs were burnt as a firefighter and he smoked. Juror Boyer's answer was concerning because the decedent's medical records stated that he was a life-long smoker and that he quit several years before his death. Thus, Mr. Rakes preferred that this fact not be mentioned at trial to prevent bias against the decedent for causing/contributing to his own lung problems by smoking.

Although we do not agree with Mr. Rakes' assertion that Juror Boyer was the only member of the panel to display a strong connection between smoking and COPD, we are not convinced that the circuit court's decision allowing her to be peremptorily struck was improper. The circuit court was able to evaluate the demeanor of Juror Boyer first-hand. There may have indeed been a legitimate issue with the way Juror Boyer conveyed her opinions that made Mr. Rakes believe, for reasons not involving race, that she would not have been a good juror for his case. In particular, the way she spoke about "catching" emphysema, along with demeanor or body language only those at trial could observe, may have been a legitimate reason to cause Mr. Rakes'

30

counsel to believe that she would not be a good juror.[14] Furthermore, there are many

medical records that were used at trial that state that the decedent was a life-long smoker

who had recently quit. Mr. Rakes' counsel did not want the issue raised at any time

during trial because of juror bias against smokers who may cause their own poor health

conditions. This was a discretionary ruling by the circuit court, and we see no error in its

ruling meriting reversal. This Court gives substantial deference to the trial court's ruling.

*Parham v. Horace Mann Ins. Co.*, 200 W. Va. 609, 615, 490 S.E.2d 696, 702 (1997).

Therefore, because the circuit court's ruling is given substantial deference, and because

Mr. Rakes gave a credible, non-discriminatory reason for striking Ms. Boyer as a juror,

the circuit court properly denied Dr. Stephens' motion for a new trial.


Violation of *In Limine* Ruling

Prior to trial, the circuit court granted Dr. Stephens' motion *in limine* to

preclude any testimony that she ordered and administered Seroquel to the decedent and

that the order and administration of Haldol alone was the cause of his death. During his

opening statement, Mr. Rakes' counsel stated to the jury the following:

> Now, I looked into the physician order form, drug
> sensitivities, right at the top—this is a form that the doctors
> make orders with—has a list of Seroquel at 20:09 on

---

[14] We also observe that although Juror Vance, the former fire-fighter, also displayed a connection between smoking and COPD, he advised Mr. Rakes' counsel that he, like the decedent, had personally smoked. Thus, it appears that Juror Boyer would have been the only juror to display the connection between smoking and COPD who did not personally smoke.

September 3, 2010, drug sensitivities: Ativan, Seroquel. 20:09 he was given Haldol, 5 milligrams, a very heavy sedative. I'll note again, nowhere through any of these orders will you see where he was actually given any respiratory treatment, any treatment for the main problem that he was at the hospital, his elevated CO2 readings, 23:35 on 9/03 of 2010, Seroquel, 100 milligrams, one dose. Dr. Delilah Stephens signed beside that order.

Dr. Stephens immediately objected, arguing that counsel violated the *in limine* ruling by "clearly implying" that Dr. Stephens ordered the Seroquel. The circuit court warned counsel not to "push the envelope" or to "play games" in the courtroom. Thereafter, Mr. Rakes' counsel continued his opening statement as follows:

And then it goes on to say that this medication was ordered via a telephone order from a Dr. Toni Muncy, read back by Laura Potter. Dr. Stephens signed off on this order the following day, according to her testimony.

She denies ordering the Seroquel for this patient; however, she clearly knew about it at 10 am the next morning, as we'll see in the medical records.

Dr. Muncy—Dr. Stephens denies ordering it. Let's be clear on that. Dr. Muncy denies ordering that Seroquel medication. The nurse that's noted in the record as having administered the Seroquel, the nurse denies administering the Seroquel. The nurse has noted in the record, points to Laura Potter, says Laura Potter administered that Seroquel. Laura Potter denies administering the Seroquel.

So nobody takes credit for ordering the Seroquel, everybody denies administering it. This is Dr. Stephens' show. She's the captain of the ship.

Dr. Stephens objected again, arguing that by saying that "she denies ordering it," Mr. Rakes was implying that Dr. Stephens ordered Seroquel. Dr. Stephens further argued,

> There is no evidence ever in this case that she ordered Seroquel.
>
> And he said he was going to get up there and make that clear when we came up here the last time, and it wasn't. Instead, what he did was confuse the issue and make it sound like she did order it.
> . . . .
> [THE COURT]: There's a big difference, Mr. Shook, between she didn't do it and she denies doing it; big difference.

The circuit court reiterated that he didn't appreciate the "pushing of this envelope." Dr. Stephens' counsel moved for a mistrial and requested a limiting instruction. Both requests were denied.

Dr. Stephens asserts that Mr. Rakes' counsel's statements directly violated the *in limine* ruling and were not harmless error. As noted, part of Mr. Rakes' theory on causation was that the decedent died of ventilator failure as a result of excessive administration of the sedatives Haldol and Seroquel in the setting of his underlying chronic lung disease. Dr. Stephens contends that Mr. Rakes' counsel's statements went directly to Mr. Rakes' theory of causation and they violated the *in limine* ruling. Dr. Stephens maintains that the circuit court's denial of her motion for new trial and her request for a limiting instruction was reversible error.

In his response, Mr. Rakes asserts that counsel did not violate the *in limine* order because he never said that Dr. Stephens ordered Seroquel. Mr. Rakes states that every doctor or nurse involved in the case denies that they ordered Seroquel on the night of September 3, 2010. Moreover, none of the doctors or nurses admits to even administering Seroquel to the decedent on that night. Mr. Rakes' counsel made it clear in opening statements, closing argument, and throughout the examination of witnesses that Dr. Stephens denied giving him the Seroquel. Likewise, Dr. Stephens' counsel also made it clear in his opening that Dr. Stephens did not give him the Seroquel. Mr. Rakes contends that no one, at any time during the trial, said that Dr. Stephens ordered the Seroquel. Mr. Rakes asserts that Dr. Stephens did, however, know that the decedent had been given Seroquel, and she chose not to take any countermeasures. Thus, although Dr. Stephens argues in her brief that Mr. Rakes' counsel said she ordered Seroquel, Mr. Rakes contends that the transcript proves otherwise. Mr. Rakes maintains that there was ample time for Dr. Stephens' counsel to make it clear that she did not order the Seroquel after opening statements, even if the message was "implied" in Mr. Rakes' opening statement.

> Pursuant to Rule 103(c) of the West Virginia Rules of Evidence,
>
> [i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury. Where practicable, these matters should be determined upon a pretrial motion in limine.

In West Virginia, once a trial judge rules on a motion in limine, "that ruling becomes the law of the case unless modified by a subsequent ruling of the court. A trial court is vested with the exclusive authority to determine when and to what extent an in limine order is be modified." Syl. Pt. 2, *Adams v. Consol. Rail Corp.*, 214 W.Va. 711, 591 S.E.2d 269 (2003)(*quoting* Syl. Pt. 4, *Tennant v. Marion Health Care Foundation*, 194 W.Va. 97, 459 S.E.2d 374 (1995)).

A party's failure to follow a trial judge's *in limine* ruling is not always reversible error. It is subject to a harmless error analysis. *See Ilosky v. Michelin Tire Corp*, 172 W.Va. 435, 449, 307 S.E.2d 603, 618 (1983) (finding that violation of the trial court's *in limine* ruling was harmless error as it did not go to causation). Rule 61 of the *West Virginia Rules of Civil Procedure* states:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

W.V.R.C.P. 61. The appropriate test for harmless error is whether a court can say "with fair assurance, after stripping the erroneous evidence from the whole, that the remaining evidence was independently sufficient to support the verdict and that the judgment was not substantially swayed by the error." *McDougal v. McCammon*, 193 W. Va. 229, 239,

455 S.E.2d 788, 798 (1995) (*citing State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979)). Mr. Rakes' counsel never stated that Dr. Stephens ordered Seroquel. The circuit court therefore did not err. Furthermore, even if there were "implications" that Dr. Stephens believes were intended, we believe the circuit court was in the best position to determine this. Moreover, even if present, we believe any "implication" was harmless and that the circuit court properly denied Dr. Stephens' motion for a new trial.

Inflammatory Comments

In her motion for a new trial, Dr. Stephens claimed that Mr. Rakes' counsel used certain phrases during opening and closing statements that were calculated to inflame, prejudice or mislead the jury and exceeded the scope of permissible arguments allowed under West Virginia law. First, during his opening statement, Mr. Rakes' counsel referred to Dr. Stephens as the "captain of the ship."[15] At the close of Mr. Rakes' case-in-chief, Dr. Stephens' counsel brought the fact that the doctrine was abolished to the circuit court's attention and requested that a limiting instruction be given to the jury. The instruction was given by the circuit court. Dr. Stephens now submits that this instruction was too late in that the jury had already been subjected to the prejudicial statements for half of the trial.

---

[15] See footnote 10, *supra*.

Mr. Rakes responds that the context behind using the "captain of the ship" phrase was that Dr. Stephens was the attending physician, and responsible for the course of treatment she chose for the decedent. He contends that counsel made limited use of this phrase solely for the purpose of describing Dr. Stephens' role as attending physician during opening statements. Thus, Mr. Rakes argues that he was merely using the phrase as description of the facts, not as his theory of liability in the case.

Dr. Stephens also asserts that during closing argument, Mr. Rakes' counsel inappropriately argued to the jury that Dr. Stephens hired the "best lawyers in the country" to protect "their money." Mr. Rakes' counsel informed the jury that the decision the jury makes affects the community and that the jury can impliedly not let the community down. Dr. Stephens objected and moved for a mistrial, arguing that the use of the phrase implied that there was insurance money available. Likewise, Dr. Stephens' counsel argued that it was improper for Mr. Rakes' counsel to request the jury to send a message to the community so that this type of case would not happen again. The circuit court overruled the objection and denied Dr. Stephens' motion.

This Court has stated that "great latitude is allowed counsel in argument of cases, but counsel must keep within the evidence, not make statements calculated to inflame, prejudice or mislead the jury, nor permit or encourage witnesses to make remarks which would have a tendency to inflame, prejudice or mislead the jury." Syl. Pt. 2, *State v. Kennedy*, 162 W.Va. 244, 249 S.E.2d 188 (1978). In syllabus point one of

37

*Black v. Peerless Elite Laundry Co*., 113 W.Va. 828, 169 S.E. 447 (1933), we explained that "[t]his court will not consider errors predicated upon the abuse of counsel of the privilege of argument, unless it appears that the complaining party asked for and was refused an instruction to the jury to disregard the improper remarks, and duly excepted to such refusal." (*quoting* Syl. Pt. 6, *McCullough v. Clark*, 88 W. Va. 22, 106 S.E. 61 (1921)).

We find no error in the circuit court's rulings. Mr. Rakes' "captain of the ship" comment could be construed not to convey that Dr. Stephens was vicariously liable for the actions of nursing staff or other doctors, but rather that she was responsible for the course of treatment she recklessly set into action; in other words, what was in her control. Regardless, a curative instruction was given by the circuit court that explained to the jury very clearly that Dr. Stephens could not be held liable for the actions of any of the other doctors or staff, and to disregard the use of that terminology. We think this instruction was sufficient to cure any error that could have occurred. Accordingly, we conclude that the comments did not amount to reversible error pursuant Rule 61 of the West Virginia Rules of Civil Procedure.

In making the determination of whether the verdict was influenced by trial error, the trial court must ascertain whether it has grave doubt about the likely effect of an error on the jury's verdict. The error is deemed harmful only if the reviewing court has grave doubt. *Lacy v. CSX Transp. Inc*., 205 W. Va. 630, 644, 520 S.E.2d 418, 432 (1999).

Although comments made during a closing argument may be prejudicial, they will be treated as harmless error when the jury has been adequately instructed. *See Foster v. Sakhai*, 210 W. Va. 716, 729, 559 S.E.2d 53, 66 (2001). Considering the evidence in light most favorable to Mr. Rakes, the circuit court properly denied Dr. Stephens' motion for a new trial.

Do Not Resuscitate Order

Dr. Stephens lastly asserts that the circuit court's refusal of her "Do Not Resuscitate" jury instruction was error. Prior to trial, the circuit court ruled that the decedent's "Do Not Resuscitate" (DNR) medical orders would be admissible at trial. Dr. Stephens offered the following proposed jury instruction during trial:

> Ladies and gentlemen, in West Virginia, every person shall be presumed to consent to the administration of cardiopulmonary resuscitation in the event of cardiac or respiratory arrest unless a do-not-resuscitate order has been issued for that individual. It is well established under the law in West Virginia, that all health care providers shall comply and respect a do-not-resuscitate order when completed by a physician. Under the law in West Virginia, a health care provider can be subject to criminal prosecution or civil liability for providing cardiopulmonary resuscitation to a person when a do not resuscitate order has been issued for that person. W.Va. Code § 16-30C-1, *et seq.*

The circuit court refused the instruction over Dr. Stephens' objection. In its order denying Dr. Stephens' renewed motion for judgment as a matter of law, or in the alternative motion for a new trial, the circuit court found that the instruction was simply

39

an incorrect statement of the law, which Dr. Stephens acknowledged by offering to

modify it. The circuit court further found that Mr. Rakes agreed that

> the DNR order would have precluded any intubation and
> resuscitation of the decedent when he finally went into
> cardiac arrest early in the morning on September 5, 2010. [Dr.
> Stephens] referred to the DNR order in her case in chief.
> Nevertheless, there was no reason to submit such an
> instruction to the jury when the question of whether to
> intubate or resuscitate the decedent was simply not an issue
> with regard to [Dr. Stephens'] treatment (or lack thereof
> pursuant to [Mr. Rakes'] theory of causation) of the decedent
> on September 3, 2010, or on September 4, 2010. Those were
> the primary dates on which [Mr. Rakes] focused in its
> medical malpractice action. [Dr. Stephens] argued that the
> decedent appeared in no acute distress on those dates,
> therefore, the DNR instruction had no bearing on the
> decedent's condition at that time. Further, when the decedent
> finally died on September 5, 2010, the evidence indicated that
> he could not be saved at that point, whether a DNR order was
> in place or not. [Dr. Stephens] was not impaired in presenting
> [her] own theory of the case regardless.

Dr. Stephens asserts that the proposed jury instruction was an accurate statement of the

law and should have been given, and that the failure to do so impeded Dr. Stephens'

theory of the case (i.e., proving no proximate causation) as developed through the

evidence.


In response, Mr. Rakes maintains that the proposed instruction was a

misstatement of the applicable law. He contends that the proposed instruction included a

provision that imposes criminal penalties on a health care provider if they perform CPR

on someone with a DNR order. However, this provision does not exist anywhere in the

40

statute cited by Dr. Stephens in her proposed instruction. Moreover, although the parties agreed there was a DNR order in place, Mr. Rakes asserts that the proposed instruction is not relevant to this case. This is because it was Mr. Rakes' theory that Dr. Stephens' deviations from the acceptable standard of care and recklessness caused the decedent's health to decline to the point where he went into respiratory arrest.

In her reply, Dr. Stephens argues that West Virginia Code § 16-30C-9(b) states, in part, that

> [n]o health care provider . . . shall be subject to criminal prosecution or civil liability for providing cardiopulmonary resuscitation to a person for whom a [DNR] order has been issued, provided that such physician . . . (1) reasonably and in good faith was unaware of the issuance of DNR order; or (2) reasonably and in good faith believed that consent to the [DNR] order had been revoked or canceled.

Dr. Stephens argues that this language makes it apparent that if a physician knows there is a DNR order and intentionally violates it by providing CPR, she can be subject to criminal or civil liability. Moreover, Dr. Stephens agreed to remove this portion of the proposed instruction, but the circuit court refused. She argues that the proposed instruction was relevant to Dr. Stephens' defense that she did not proximately cause the decedent's death. She contends that she ordered that BiPAP be administered on the night of September 4, 2010, but the order was not followed. Once the decedent coded, the DNR order prevented anyone from resuscitating him, which she argues was a break in causation.

41

This Court has held that "[a]n instruction which does not correctly state the law is erroneous and should be refused." Syl. Pt. 2, *State v. Collins*, 154 W. Va. 771, 180 S.E.2d 54 (1971). Likewise, we have stated that

> [e]ven if a requested instruction is a correct statement of the law, refusal to grant such instruction is not error when the jury was fully instructed on all principles that applied to the case and the refusal of the instruction in no way impeded the offering side's closing argument or foreclosed the jury's passing on the offering side's basic theory of the case as developed through the evidence.

Syl. Pt. 2, *Shia v. Chvasta*, 180 W. Va. 510, 377 S.E.2d 644 (1988).

We agree with the circuit court's ruling that the proposed instruction is not relevant to this case. It was Mr. Rakes' theory that Dr. Stephens' deviations from the acceptable standard of care and recklessness caused the decedent's health to decline to the point where he went into respiratory arrest. The DNR order was not a break in causation alleviating any of the negligent or reckless actors from liability for proximately causing the decedent's death. Accordingly, we affirm the circuit court's ruling on this issue.

## IV.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court's orders denying Dr. Stephens' motions for summary judgment and renewed motion for judgment as a matter of law, or in the alternative motion for a new trial.

**Affirmed.**

42