# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Spring 2024 Term

_____

No. 23-ICA-58

_____

JOHN R. ORPHANOS, M.D.,
Defendant Below, Petitioner,

v.

MICHAEL RODGERS,
Plaintiff Below, Respondent.

FILED

June 13, 2024

released at 3:00 p.m.
ASHLEY N. DEEM, DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

_____

Appeal from the Circuit Court of Kanawha County
Honorable Tera Salango, Judge
No. 19-C-561

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART
_____

Submitted:  January 9, 2024
Filed:  June 13, 2024

Thomas J. Hurney, Esq.
Blair E. Wessels, Esq.
Jackson Kelly PLLC
Charleston, West Virginia

Richard D. Jones, Esq.
J. Dustin Dillard, Esq.
Flaherty Sensabaugh Bonasso, PLLC
Charleston, West Virginia
Counsel for Petitioner

John W. Barrett, Esq.
P. Gregory Haddad, Esq.
Kerrie W. Boyle, Esq.
Sharon F. Iskra, Esq.
Bailey Glasser, LLP
Charleston, West Virginia
Counsel for Respondent

Stephen M. Fowler, Esq.
Geoffrey Cullop, Esq.
Pullin, Fowler, Flanagan, Brown & Poe PLLC
Charleston, West Virginia
Counsel for Board of Risk and Insurance Management of the State of West Virginia,
Amicus Curae


Chelsea V. Brown, Esq.
Bowles Rice LLP
Morgantown, West Virginia
Counsel for Amici Curiae, West Virginia University Board of Governors, West Virginia
Health Care Association, American Medical Association, and West Virginia State
Medical Association

Ancil G. Ramey, Esq.
Steptoe & Johnson PLLC
Huntington, West Virginia

Christine S. Vaglienti, Esq.
West Virginia University Health System Legal Services
Morgantown, West Virginia
Counsel for Amici Curiae, West Virginia Health System, Inc. d/b/a West Virginia
University Health System


CHIEF JUDGE SCARR delivered the Opinion of the Court.

SCARR, CHIEF JUDGE:

Petitioner, John R. Orphanos, M.D., appeals the Circuit Court of Kanawha County's September 12, 2022, judgment order following a jury trial, and January 20, 2023, order denying his renewed motion for judgment as a matter of law on the issue of recklessness and a separate motion for new trial. This case involves a medical malpractice lawsuit filed by Michael Rodgers against Dr. Orphanos in relation to spinal surgery performed after Mr. Rodgers was injured in a motorcycle accident in 2017. This appeal arises out of a medical malpractice jury trial, in which the jury returned a verdict for Mr. Rodgers with a final, reduced award of $9,862,384.58.[1]

Upon extensive review of the briefs, the appendix record, arguments presented by counsel, and the applicable legal authority, this Court affirms the January 20, 2023, order denying Dr. Orphanos' renewed judgment as a matter of law. However, we reverse and remand in part the January 19, 2023, denial of Dr. Orphanos' motion for a new trial, and reverse in part the September 12, 2022, judgment order, for a new trial solely on damages consistent with this opinion.[2]

---

[1] This Court acknowledges and appreciates the amicus briefs filed by the respective organizations listed above in support of Dr. Orphanos' position on recklessness in this case.

[2] The circuit court below only needs to hold a new trial on damages. For the reasons mentioned below, this court concludes that the circuit court abused its discretion in denying Dr. Orphanos' supplemental expert disclosure of Jodi A. Gehrig's, M.D., testimony on Mr. Rodgers' life expectancy which is relevant to the overall damages.

1

# I.    FACTUAL AND PROCEDURAL BACKGROUND

On June 4, 2017, Michael Rodgers, then 49 years old, was injured in a motorcycle crash. He was life-flighted to CAMC General in Charleston, a Level 1 Trauma Center. In the emergency department, physicians performed a chest computed tomography ("CT") scan which revealed a T5 Chance fracture (a transverse fracture through a vertebral body and neural arch). Mr. Rodgers was admitted to the Surgical Trauma Intensive Care Unit for further treatment and Dr. Orphanos, a neurosurgeon, was contacted for a neurosurgical consultation.

A nurse practitioner from Dr. Orphanos' practice first saw Mr. Rodgers at 11:30 a.m. on June 5, 2017. That nurse practitioner performed an initial assessment, placed him on spinal precautions, and ordered a thoracic lumbar sacral orthosis brace to be worn for a period of 6-8 weeks. Dr. Orphanos saw Mr. Rodgers later that afternoon and recommended a spinal surgical procedure as an alternative to the conservative treatment approach of the back brace. Mr. Rodgers agreed to the surgery and Dr. Orphanos performed a fusion of levels T2 through T6 the next day, on June 6, 2017, which involved placing orthopedic screws into the vertebrae to stabilize the fracture.

Postoperatively, Mr. Rodgers had no motor function or sensation below his nipple line.[3] A repeat thoracic CT scan showed trace bilateral pleural effusions surrounding the pedicle screws within the T2 and T3 levels, skipping T4, with screws in T5 and T6. The CT scan did not show anything that explained the paralysis, such as spinal cord compression, misalignment of the orthopedic screws, or evidence of a forming epidural hematoma. Dr. Orphanos recommended that Mr. Rodgers be returned to surgery for a T5 laminectomy. During that second surgery, Dr. Orphanos found no evidence of compression or other interference with the spinal cord.

On June 20, 2017, Mr. Rodgers was transferred to a subacute rehabilitation center for further care and was discharged home on July 20, 2017. Mr. Rodgers' paraplegia persisted and was ultimately determined to be permanent. According to Dr. Orphanos' experts, the paralysis was caused by a spinal cord infarct, that occurred during the surgery, which was neither predictable nor preventable. One of Mr. Rodgers' treating neurologists, Joby Joseph, M.D., apparently told Mr. Rodgers' mother that he believed the paralysis was caused by a spinal cord infarct. Another of Dr. Orphanos' experts, Dennis Whaley, M.D., opined that the paraplegia was caused by a vascular injury sustained at the time of the motorcycle accident itself.

---

[3] Preoperatively, Mr. Rodgers was fully intact neurologically. His muscle resistance tests showed that he had intact muscle strength, and intact sensation with full strength in his legs and hip muscles.

Mr. Rodgers filed a complaint against Dr. Orphanos on May 30, 2019, alleging three breaches of the standard of care: (1) prior to the first surgery, Dr. Orphanos should have ordered a magnetic resonance imaging ("MRI") of the thoracic spine instead of relying solely on the CT; (2) during the surgery, Dr. Orphanos should have used intraoperative neurophysiological monitoring ("IONM") to monitor the spinal cord while placing the surgical screws; and (3) after learning about the paralysis after the first surgery, Dr. Orphanos should have ordered a CT myelogram to locate and repair the cord injury before it became irreversible. Mr. Rodgers further claimed that Dr. Orphanos' treatment amounted to gross negligence and recklessness and sought punitive damages.[4]

During discovery, on July 9, 2020, Mr. Rodgers was diagnosed with a right-sided, middle cerebral artery embolic stroke, which left him with left-sided hemiparesis (weakness or paralysis on one side of the body). He did not amend his complaint to allege that Dr. Orphanos' 2017 care caused or contributed to his July 2020 stroke.

On January 25, 2021, Mr. Rodgers filed a motion for partial summary judgment, arguing that the Trauma Cap of the Medical Professional Liability Act ("MPLA"), West Virginia Code § 55-7B-9c, did not apply because two statutory exceptions were implicated: (1) the surgery did not qualify as an "emergency" under West

---

[4] Mr. Rodgers later dropped his punitive damages claim, stating that he has "never alleged punitive damages in this case." *See* App. P. 746.

4

Virginia Code § 55-7B-9c(h)(1); and (2) Dr. Orphanos' treatment and conduct were "reckless" under West Virginia Code § 55-7B-9c(h)(1). The circuit court denied the motion, concluding that the jury would determine whether the surgery was an emergency and whether Dr. Orphanos acted recklessly.

On January 5, 2022, about two months before the March 14, 2022, trial date, Mr. Rodgers served a second amended expert witness disclosure that included a new life care plan and economic report effectively claiming a connection between Mr. Rodgers' 2020 stroke and Dr. Orphanos' 2017 care. Dr. Orphanos moved to exclude these reports because they were untimely produced, and no expert was identified to causally link the 2017 care to the 2020 stroke. In a separate motion, Dr. Orphanos moved to continue the trial date, arguing that Mr. Rodgers added a new claim to the case without providing an opportunity to conduct discovery. During a hearing on the motions, Mr. Rodgers' counsel offered to provide Dr. Orphanos "great latitude" in responding to the new disclosures. On February 24, 2022, the circuit court denied both of Dr. Orphanos' motions.

On March 7, 2022, Dr. Orphanos served his second supplemental expert disclosure, including rebuttal opinions to Mr. Rodgers' new expert opinions. Despite the earlier assurance of "great latitude," Mr. Rodgers moved to strike the experts, arguing that the supplemental disclosure was untimely and prejudicial. During the circuit court's March 14, 2022, pre-trial hearing, held the day before jury selection, the circuit court granted in part and denied in part Mr. Rodgers' motion to strike. The court precluded Dr. Orphanos

5

from offering expert testimony from Dr. Gehrig discussing the effect the 2020 stroke had on Mr. Rodgers' life expectancy.

Also heard at the pre-trial hearing were Dr. Orphanos' two motions regarding Mr. Rodgers' claim that Dr. Orphanos acted with a "reckless disregard of a risk of harm to the patient" under West Virginia Code § 55-7B-9c(h)(1), his motion for partial summary judgment on claims other than medical negligence, and his motion *in limine* to preclude Mr. Rodgers from asserting or arguing that he was "reckless." In both motions, Dr. Orphanos argued that none of Mr. Rodgers' experts opined that he was "reckless," and that he had disclosed experts who testified that his treatment met the standard of care. As such, Dr. Oprhanos contended that there was no expert evidence that his care amounted to anything beyond simple negligence, thus Mr. Rodgers should have been barred from arguing "recklessness" at trial. The circuit court denied both motions, holding that the determination of whether Dr. Orphanos was reckless would be based on the totality of the evidence presented at trial and not on any one expert's opinion.

Dr. Orphanos also presented three other motions *in limine* at the pretrial hearing: (1) his motion *in limine* to exclude medical expenses not supported by expert testimony, relating to the testimony of Nurse Taniguchi; (2) his motion *in limine* to exclude the testimony of Mr. Rodgers' expert, David Feinberg, M.D., regarding the applicable standard of care; and (3) his motion *in limine* to exclude evidence or testimony regarding

miscounting of vertebral bodies during surgery. The circuit court denied all three motions at the pretrial conference.

The seven-day trial began on March 15, 2022. At trial, Mr. Rodgers called his mother, Bonnie Rodgers as a witness. Mrs. Rodgers testified about personal notes she made while talking to her son's treating physicians; Dr. Orphanos moved to introduce those notes into evidence. Without objection, the court admitted the notes. Dr. Orphanos' counsel then sought to question Mrs. Rodgers on her notes about a conversation she had with Joby Joseph, M.D., who told her that he believed her son's paralysis was caused by an 'infarction just above T3/T4" that "would have happened at the time of the accident" resulting in a "possible spinal stroke." Mr. Rodgers' counsel objected, arguing the admission of the notes would violate the court's ruling on Dr. Orphanos' motion *in limine* precluding standard of care or causation opinions not previously disclosed. The circuit court sustained the objection and disallowed the previously admitted notes, meaning that Dr. Orphanos was precluded from inquiring about the conversation.

On March 16, 2022, Mr. Rodgers called Mark Weidenbaum, M.D., his standard of care expert, and moved to qualify him as an expert in spine surgery. Dr. Orphanos objected as to an insufficient foundation regarding whether Dr. Weidenbaum had experience in treating Chance fractures. The circuit court overruled the objection.

7

After the close of evidence, Dr. Orphanos moved for partial judgment as a matter of law under Rule 50(a) of the *West Virginia Rules of Civil Procedure*, arguing that the evidence was insufficient to allow the issue of recklessness to be presented to the jury, as there was no expert testimony of recklessness, and the evidence otherwise failed to establish recklessness. Mr. Rodgers countered that the MPLA does not require expert testimony on the issue of recklessness and the jury could determine it based on the totality of evidence. The circuit court denied Dr. Orphanos' motion.

Before the court instructed the jury, it directed counsel to submit a proposed jury charge that explained the parties' respective objections to ensure that all objections were preserved. Dr. Orphanos objected to any instruction referencing recklessness and to the instruction defining recklessness misstating the law based on West Virginia Code § 55-7B-9c(h)(1) and West Virginia case law. Dr. Orphanos also objected to the inclusion of an instruction on "emergency surgery" because whether the surgery constituted an "emergency" was irrelevant to the application of the Trauma Cap. The circuit court overruled Dr. Orphanos' objections. Dr. Orphanos also objected to the proposed verdict form because the first question it asked the jury to determine was whether the first surgery was an emergency surgery, rather than a question on the standard of care.

During Mr. Rodgers' closing argument, Dr. Orphanos objected to the use of a pie chart that showed pieces of the "pie" relating to claimed damages. The largest slice was labeled as non-economic damages. Dr. Orphanos argued that this was an inappropriate

8

suggestion to the jury that a larger amount should be awarded for non-economic damages. The circuit court overruled that objection.

On March 24, 2022, after deliberations, the jury returned a verdict for Mr. Rodgers, finding that: (1) the first surgery was not an "emergency surgery"; (2) Dr. Orphanos was negligent; (3) Dr. Orphanos' breach of the standard of care caused or contributed to the paraplegia; (4) Dr. Orphanos was reckless in his care and treatment; (5) Dr. Orphanos' negligence caused or contributed to the 2020 stroke; and (6) Mr. Rodgers was not negligent in failing to present to the ER prior to his 2020 stroke. Based on these findings, the jury returned the following verdict as to the paraplegia and the 2017 surgery:

| | |
|---|---|
| Past expenses for care and treatment | $1,374,079.00 |
| Lost earning capacity | $591,166.00 |
| Future care, treatment, renovation | $6,511,940.00 |
| Past pain, suffering, loss of enjoyment | $1,000,000.00 |
| Future pain, suffering, loss of enjoyment | $1,500,000.00 |

For the 2020 stroke, the jury awarded additional damages:

| | |
|---|---|
| Additional future care and treatment | $1,793,690.00 |
| Future pain, suffering, loss of enjoyment | $5,000,000.00 |
| TOTAL | $17,770,875.00 |

On April 13, 2022, Dr. Orphanos filed a motion to reduce the verdict consistent with the MPLA Trauma Cap, which Mr. Rodgers opposed. The circuit court heard argument on April 29, 2022, and entered an order (1) deferring ruling (by agreement of Mr. Rodgers' counsel) on the motion to reduce the entire verdict under the MPLA's

9

Trauma Cap; (2) applying West Virginia Code § 55-7B-8 to reduce the verdict for non-economic damages to $750,000.00; and (3) taking under advisement Dr. Orphanos' motion to reduce the award of medical expenses. The circuit court also instructed the parties to exchange additional information on the medical bills, which they did, and then filed supplemental briefing. The circuit court held another hearing on June 30, 2022.

The circuit court entered its judgment order on September 12, 2022, concluding that based on the jury's verdict and mandatory reductions required by the MPLA, the judgment against Dr. Orphanos included: (1) past and future pain, suffering, and loss of enjoyment of life totaling $750,000.00; (2) lost earning capacity totaling $591,166.00; (3) past expenses for care and treatment totaling $215,588.58; and (4) future care, treatment, and renovation expenses totaling $8,305,630.00. The judgment totaled $9,862,384.58.

After the judgment order was entered, Dr. Orphanos filed a renewed motion for judgment as a matter of law on the issue of recklessness and a separate motion for new trial. Also, Mr. Rodgers filed a motion to alter or amend the judgment. The circuit court heard these motions and denied them by orders dated January 20, 2023.[5]

---

[5] Mr. Rodgers' appealed the circuit court's judgment to this Court in case No. 23-ICA-64; however, it was stricken from this Court's docket by an agreed voluntary dismissal order pursuant to West Virginia Rules of Appellate Procedure 27(a) entered January 4, 2024.

## II. STANDARD OF REVIEW

On appeal, Dr. Orphanos asserts sixteen assignments of error ranging from errors of law to evidentiary rulings made by the circuit court.[6] Based on the numerous assignments of error, and precedent by the Supreme Court of Appeals of West Virginia ("SCAWV"):

> [w]e will set out the standard of review for each issue as it is addressed below. *See State v. Boyd*, 238 W. Va. 420, 428, 796 S.E.2d 207, 215 (2017) ("We will dispense with our usual standard of review section because each of the assignments of error has its own review criteria."); *State v. Dunn*, 237 W. Va. 155, 158, 786 S.E.2d 174, 177 (2016) ('Therefore, we dispense with setting out a general standard of review. Specific standards of review will be discussed separately as we address each assignment of error.").

*McClure Mgmt., LLC v. Taylor*, 243 W. Va. 604, 611-12, 849 S.E.2d 604, 611-12 (2020).

## III. DISCUSSION

### A. Renewed Judgment as a Matter of Law

We first will address Dr. Orphanos' arguments regarding his renewed judgment as a matter of law.

"The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the

---

[6] We have reordered Dr. Orphanos' assignments of error to accord with our analysis. *See, e.g., Harlow v. E. Elec., LLC*, 245 W. Va. 188, 195 n.25, 858 S.E.2d 445, 452 n.25 (2021).

11

*West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. Pt. 1, *Fredeking v. Tyler*,

224 W. Va. 1, 680 S.E.2d 16 (2009). Further, the SCAWV has consistently held:

> [w]hen this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b), it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party. *See*, Syllabus Point 2, *Alkire v. First Nat. Bank of Parsons*, 197 W. Va. 122, 475 S.E.2d 122 (1996).

*Id.* at 5, 680 S.E.2d at 20.

> Notably, under the MPLA a plaintiff is required to prove:
>
> an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:
>
> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and
>
> (2) Such failure was a proximate cause of the injury or death.

W. Va. Code § 55-7B-3(a) (2003). Further, "[t]he applicable standard of care and a

defendant's failure to meet the standard of care, if at issue, *shall* be established in medical

professional liability cases by the plaintiff by testimony of one or more knowledgeable,

competent expert witnesses *if required by the court*." W. Va. Code § 55-7B-7(a) (emphasis

added).

The MPLA Trauma Cap statute, codified as West Virginia Code § 55-7B-9c

(2016) is the primary contention in this case. The Trauma Cap provides, in part as follows:

(a) In any action brought under this article for injury to or death of a patient as a result of health care services or assistance rendered in good faith and necessitated by an emergency condition for which the patient enters a health care facility designated by the Office of Emergency Medical Services as a trauma center, including health care services or assistance rendered in good faith by a licensed emergency medical services authority or agency, certified emergency medical service personnel or an employee of a licensed emergency medical services authority or agency, *the total amount of civil damages recoverable may not exceed $500,000, for each occurrence*, exclusive of interest computed from the date of judgment, and regardless of the number of plaintiffs or the number of defendants or, in the case of wrongful death, regardless of the number of distributees.

(b) On January 1, 2016, and in each year thereafter, the limitation on the total amount of civil damages contained in subsection (a) of this section shall increase to account for inflation as determined by the Consumer Price Index published by the United States Department of Labor: *Provided*, That increases on the limitation of damages shall not exceed one hundred fifty percent of the amounts specified in said subsection.

(c) Beginning July 1, 2016, a plaintiff who, as a result of an injury suffered prior to or after said date, suffers or has suffered economic damages, as determined by the trier of fact or the agreement of the parties, in excess of the limitation of liability in section (a) of this section and for whom recovery from the Patient Injury Compensation Fund is precluded pursuant to section one, article twelve-d, chapter twenty-nine of this code *may recover additional economic damages of up to $1 million*. This amount is not subject to the adjustment for inflation set forth in subsection (b) of this section.

(d) The limitation of liability in subsection (a) of this section also applies to any act or omission of a health care provider in rendering continued care or assistance in the event that surgery is required as a result of the *emergency condition* within a reasonable time after the patient's condition is stabilized.

(e) The limitation on liability provided under subsection (a) of this section *does not apply* to any act or omission in rendering care or assistance which:

(1) Occurs after the patient's *condition is stabilized* and the patient is capable of receiving medical treatment as a nonemergency patient; or
(2) Is unrelated to the original emergency condition.

…

(h) The limitation on liability provided under subsection (a) of this section *does not apply* where health care or assistance for the emergency condition is rendered

(1) In *willful and wanton or reckless disregard* of a risk of harm to the patient….

W. Va. Code § 55-7B-9c (2016) (emphasis added) (amended in 2024).

First, Dr. Orphanos argues that the circuit court erred in finding that the MPLA does not require expert testimony on the issue of recklessness. He asserts that the MPLA expressly requires that a defendant's failure to meet the standard of care shall be established by expert testimony. *See* W. Va. Code § 55-7B-7(a) (2015) ("The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court."). Next, Dr.

Orphanos argues that assuming the MPLA requires expert testimony to establish recklessness, the circuit court erred in denying his motion for judgment as a matter of law, as there was legally insufficient evidence to support Mr. Rodgers' claim.

We are tasked with deciding whether under the MPLA Trauma Cap, an expert witness is required to testify that not only did the doctor breach the applicable standard of care, but the doctor went so far as to being reckless in his care. However, this Court concludes it is not necessary to decide the issue of recklessness in the context of the MPLA Trauma Cap because it is not the sole avenue for a claim to avoid its limitation.[7] The Trauma Cap provides that the "limitation on liability provided under subsection (a) of this section does not apply where health care or assistance for the emergency condition is rendered: (1) in willful and wanton or reckless disregard of a risk of harm to the patient…." W. Va. Code § 55-7B-9c(h)(1). Notably, the act provides another exception, in that the act "does not apply to any act or omission in rendering care or assistance which: (1) [o]ccurs after the patient's condition is stabilized and the patient is capable of receiving medical treatment as a nonemergency patient; or (2) is unrelated to the original emergency condition." *Id.* at § 55-7B-9c(e). Thus, if a surgery is done so recklessly or as a

---

[7] While this Court concludes that it is unnecessary to determine if Dr. Orphanos performed the surgery recklessly, we note that under the MPLA there is no mandatory language requiring expert testimony on recklessness. The MPLA states that such expert testimony is left to the discretion of the lower court as guided by the rules of evidence. *See* W. Va. Code 55-7B-7(a) (stating that expert testimony shall be necessary "if required by the court").

15

nonemergency, and any resulting damage is found to be the result of a breach of the standard of care, the Trauma Cap will not apply.

On appeal, Dr. Orphanos does not directly argue in his brief about the emergency surgery applicability aspect under the MPLA Trauma Cap, but below, he countered Mr. Rodgers' motion for a directed verdict on this issue. Below, Dr. Orphanos argued that the emergency surgery portion of the MPLA Trauma Cap is inapplicable because it has nothing to do with the Trauma Cap. He asserts that the Trauma Cap provides if a surgery is required even after the patient is stabilized, and that surgery is being done because of the original emergency condition, which everyone agrees that Mr. Rodgers came into a designated trauma center with an emergency condition, then the Trauma Cap applies.[8] Specifically, Dr. Orphanos is relying on section 55-9B-9c(d), which states:

> [t]he limitation of liability in subsection (a) of this section also applies to any act or omission of a health care provider in rendering continued care or assistance in the event that surgery is required as a result of the emergency condition within a reasonable time after the patient's condition is stabilized.

---

[8] The circuit court denied Mr. Rodgers' motion for a directed verdict on this issue and permitted the issue of whether the surgery was an "emergency surgery" to go to the jury.

16

Here, the jury found that Mr. Rodgers' surgery was not an emergency surgery under the MPLA.[9] Emergency surgery itself is not defined by the act, however, "emergency condition" is. The MPLA defines "Emergency Condition" as

> any acute traumatic injury or acute medical condition which, according to standardized criteria for triage, involves a significant risk of death or the precipitation of significant complications or disabilities, impairment of bodily functions or, with respect to a pregnant woman, a significant risk to the health of the unborn child.

W. Va. Code § 55-7B-2(d) (2022).

On appeal, following a renewed judgment as a matter of law after a jury verdict, our "task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below." Syl. Pt. 2, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009). We conclude there was sufficient evidence to reach such a conclusion. Dr. Orphanos and every physician who provided testimony on the issue concurred that the procedure was not deemed an emergency surgery. This conclusion was supported by several factors, including Mr. Rodgers' admission on June 4, the neurology evaluation not occurring until roughly twelve hours post-admission, and the surgery not taking place until June 6, all while displaying normal neurological findings during the pre-operative phase.[10] Further, it is undisputed that Mr. Rodgers had two choices for

---

[9] Dr. Orphanos also asserts that the jury instruction presented to the jury on emergency surgery was incorrect. This portion of his argument is laid out below.

[10] *See* App. 2763, 2847 (Dr. Weidenbaum) ("[T]he definition of emergency surgery is when there is an acute threat to either life or limb. So[,] at the time, [Mr. Rodgers] was

17

treatment—a conservative, nonsurgical back brace or the rods-and-screws surgery he elected to have performed.

Therefore, we conclude it is clear from the record, and the concessions made by Dr. Orphanos himself, that a reasonable jury could find that Mr. Rodgers' first surgery after the accident was not an emergency surgery. Thus, having concluded that a reasonable jury could find that Mr. Rodgers' surgery was not an emergency surgery, his resulting damages from Dr. Orphanos' negligence are outside of the Trauma Cap.

### B. Motion for New Trial

Now, we turn to Dr. Orphanos' denied motion for a new trial and his assignments of error associated therewith.[11]

---

clinically stable so it was not an emergent issue."); App. 2896 (Dr. Orphanos) (agreeing that "this was not an emergent surgery based upon the records you see from the operating room[.]); App. 2850–2852 (Dr. Orphanos) (agreeing that when he evaluated Mr. Rodgers more than 24 hours before the surgery "he was not a patient that was an emergency that required you to rush him to the emergency department to save his life and limb[.]"); App. 2856 (Dr. Orphanos) (agreed that "there was no emergency situation that required [him] to rush him to the operating room because of fear of deterioration that might prejudice or jeopardize his life or limb[.]"); App. 3546 (defense expert Dr. Berkman) ("Q. You agree that this was not an emergency surgery. A. Yeah, I agree.")

[11] We note that Dr. Orphanos' first two assignments of error in this respect pertain to the issue of recklessness. First, he asserts that the circuit court abused its discretion when it denied his pre-trial motions for partial summary judgment and *in limine* regarding recklessness. Second, Dr. Orphanos asserts that the circuit court abused its discretion by reading to the jury Mr. Rodgers' proposed jury instructions defining recklessness as "an act of unreasonable character in disregard for a risk known to him or so obvious that it must be taken that he was aware of it." However, for the above-mentioned reasons, regarding the issue of recklessness in this case, this Court declines to address these arguments. The

"[O]ur standard of review for a trial court's decision regarding a motion for a new trial is abuse of discretion." *MacDonald v. City Hosp., Inc.*, 227 W. Va. 707, 715, 715 S.E.2d 405, 413 (2011) (quoting *Marsch v. American Elec. Power Co.*, 207 W. Va. 174, 180, 530 S.E.2d 173, 179 (1999)). The SCAWV has stated,

> [t]he ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal [only] when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

Syl. Pt. 2, *Grimmett v. Smith*, 238 W. Va. 54, 55, 792 S.E.2d 65, 66-67 (2016) (internal quotation marks and citations omitted). Further, the SCAWV has held:

> 'In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.' [Syllabus Point 5, *Orr v. Crowder,* 173 W. Va. 335, 315 S.E.2d 593 (1983).]

*Id.* at 60, 792 S.E.2d at 71.

### 1.  Jury Instruction on "Emergency Surgery"

First, Dr. Orphanos asserts that the circuit court abused its discretion by reading to the jury Mr. Rodgers' instruction regarding emergency surgery, and further for

---

jury in this case found that the surgery performed was not an emergency surgery, and thus finding a separate reason to eliminate the Trauma Cap, this court concludes the issue of recklessness is not dispositive and we will not further address it.

allowing a question to be posed regarding emergency surgery on the verdict form. Dr. Orphanos argues that the circuit court's instruction on emergency surgery prejudiced him because the instruction did not explain to the jury the requirement of finding that Mr. Rodgers' condition was stabilized, nor did the instruction require the jury to find whether Mr. Rodgers was a "nonemergency patient."[12] We disagree.

Jury instructions are reviewed under a two-part test. "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*." *State v. Hoard*, 248 W. Va. 428, 437, 889 S.E.2d 1, 10 (2023) (citation omitted). Further, "[w]hether facts are sufficient to justify the delivery of a particular instruction is reviewed by [the] Court under an abuse of discretion standard." *Id.* (citation omitted). "[A] jury instruction is erroneous if it has a reasonable potential to mislead the jury as to the legal principle or does not adequately inform the jury on the law. An erroneous instruction requires a new trial unless the error is harmless." *Tracy v. Cottrell ex rel. Cottrell*, 206 W. Va. 363, 376, 524 S.E.2d 879, 892 (1999).[13] However, "[a] verdict

---

[12] Dr. Orphanos argues that the circuit court abused its discretion by using the phrase "emergency surgery", as opposed to the language in the MPLA Trauma Cap statute which states, "nonemergency patient." However, this is a distinction without a difference, and this Court concludes that using "emergency surgery" in place of "nonemergency patient" did not mislead the jury.

[13] *See id.* at 370, 524 S.E.2d at 886.

20

should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties." Syl. Pt. 7, in part, *Foster v. Sakhai*, 210 W. Va. 716, 559 S.E.2d 53 (2001).

In this case, the circuit court instructed the jury as follows on emergency surgery:

> The court instructs the jury that Michael Rodgers has asserted that the surgery carried out two days after his admission to the hospital was not an emergency surgery.
>
> If you find that the surgery carried out by the Defendant was not an emergency surgery, then you should answer the special interrogatory on the verdict form accordingly.

The verdict form's first question posed was "[d]o you find that the first surgery performed on Michael Rodgers was an emergency surgery?" The jury concluded that "No" it was not an emergency surgery.

---

> To challenge jury instructions successfully, a challenger must first demonstrate the charge as a whole created a substantial and ineradicable doubt about whether the jury was properly guided in its deliberations. Second, even if the jury instructions were erroneous, we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case.

21

Further, Dr. Orphanos argues that the jury instruction given failed to correctly interpret the interplay between West Virginia Code § 55-7B-9c(e)(1) and § 55-7B-9c(d). West Virginia Code § 55-7B-9c(d) specifically states:

> The limitation of liability in subsection (a) of this section also applies to any act or omission of a health care provider in rendering continued care or assistance in the event that surgery is required as a result of the emergency condition within a reasonable time after the patient's condition is stabilized.

Dr. Orphanos asserts that Mr. Rodgers' surgery occurred within two days after he was admitted to the hospital's Surgical Trauma Intensive Care Unit as a trauma patient, and the surgery was performed as a result of the emergency condition, thus the jury instruction given prejudiced him by not outlining West Virginia Code § 55-7B-9c(d).

This Court is cognizant of the fact that "reasonable time" is not defined by West Virginia case law, nor the MPLA. However, this is not an issue. "Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion." *Keesee v. Gen. Refuse Serv., Inc.*, 216 W. Va. 199, 209, 604 S.E.2d 449, 459 (2004). Given this deferential review, we conclude that the jury instruction given was sufficient enough for the jury to determine whether or not the surgery performed was an emergency surgery.[14] For the same reasons mentioned above in section III A, there was

---

[14] Although the instruction given can be argued to be incomplete, it was not inaccurate. Here, the circuit court gave an accurate jury instruction on emergency surgery. This Court notes that it is the opposing party's burden to an instruction to propose one they

22

sufficient evidence the jury heard to determine whether or not Mr. Rodgers' surgery was an emergency surgery. Thus, the circuit court did not abuse its discretion in permitting the instruction on emergency surgery to be read to the jury.

## 2. Supplemental Expert Disclosures

Second, Dr. Orphanos asserts that the circuit court abused its discretion by failing to either exclude a supplemental expert disclosure filed by Mr. Rodgers over two months before trial and after discovery was already closed, or, in the alternative, grant a continuance to allow Dr. Orphanos adequate time to rebut the new evidence.[15] Dr. Orphanos argues that despite the great latitude promised in allowing him to respond to Mr. Rodgers' late disclosed experts, the circuit court abused its discretion in striking Dr. Gehrig's opinion that the 2020 stroke significantly reduced Mr. Rodgers' life expectancy. Not allowing Dr. Gehrig's testimony resulted in the jury awarding the full value of the new life care plan adopted by Mr. Rodgers' life care planner expert. Here, we agree, solely as it relates to striking Dr. Gehrig's life expectancy testimony.

---

believe is more in accordance with the law, and here, Dr. Orphanos only objected to such an instruction without proposing an instruction he deemed proper. Dr. Orphanos could have proposed a more complete instruction detailing West Virginia Code § 55-7B-9c(d), however, he did not. What's good for the goose is good for the gander.

[15] While Dr. Orphanos argues that the circuit court abused its discretion in allowing Mr. Rodgers to supplement his expert witness disclosures, just two months before trial, this court concludes that this was not error. Because we conclude the circuit court did not abuse its discretion in allowing Mr. Rodgers to supplement his expert witness disclosures, this argument will not be addressed any further. However, the circuit court did abuse its discretion in not allowing Dr. Orphanos to supplement his expert witness disclosures, specifically Dr. Gehrig's testimony on life expectancy, for the reasons to be mentioned.

The SCAWV has held that under Rule 26(e)(1) of the West Virginia Rules of Civil Procedure (amended 2024),

> a party responding to a discovery request is under a continuing duty to make a seasonable supplementation to its original answers to any question asking for the identity of an expert witness expected to be called at trial, the subject matter on which the expert will testify, and the substance of his testimony.

Syl. Pt. 1, in part, *State ex rel. Tallman v. Tucker*, 234 W. Va. 713, 769 S.E.2d 502 (2015).

> [F]actors that may assist a court in deciding whether to permit late supplemental expert witness disclosure include: (1) the explanation for making the supplemental disclosure at the time it was made; (2) the importance of the supplemental information to the proposed testimony of the expert, and the expert's importance to the litigation; (3) potential prejudice to an opposing party; and (4) the availability of a continuance to mitigate any prejudice.

*Id.* at 717, 769 S.E.2d at 506.

Notably, in July 2020, during the pendency of this case, Mr. Rodgers suffered an embolic stroke, leading to additional impairments. Approximately two months before the trial, on January 5, 2020, Mr. Rodgers filed a second amended expert witness disclosure, presenting a new life care plan and economic report that addressed the additional medical needs arising from the stroke, which he claimed were related to the care provided by Dr. Orphanos in 2017. On February 4, 2022, approximately five weeks before trial, Dr. Orphanos filed a motion to exclude Mr. Rodgers' updated damages report and related testimony, along with a motion to continue. Dr. Orphanos argued that these amended disclosures exceeded the discovery deadline and were submitted too close to the

24

trial, and also questioned the adequacy of medical expert support for the opinions of the life care planner. However, the circuit court denied both motions in an order dated February 24, 2022.

Subsequent to the denial of Dr. Orphanos' motions, on March 7, 2022, Dr. Orphanos further supplemented his expert disclosures, introducing an infectious disease specialist, William Petri, M.D., and providing updated reports from his own life care planner. Additionally, he expanded the opinions of his vascular neurology expert, Dr. Gehrig, to discuss the impact of the 2017 paraplegia and the 2020 stroke on Mr. Rodgers' life expectancy. On March 9, 2020, Mr. Rodgers filed a motion to strike, followed by a supplemental motion to strike dated March 14, 2022, citing prejudice due to the late disclosures. During the pre-trial conference on March 14, 2022, the circuit court partially granted Mr. Rodgers' motions to strike. While it allowed Dr. Orphanos to present evidence from Dr. Petri, it barred Dr. Gehrig from offering an opinion on life expectancy.

Here, we conclude that the circuit court abused its discretion in striking Dr. Gehrig's testimony as to Mr. Rodgers' life expectancy. Applying the *Tallman* factors to Dr. Orphanos' supplemental expert disclosures clearly shows that the circuit court abused its discretion. As noted above, Mr. Rodgers supplemented his expert disclosures merely two months before trial, and guaranteed Dr. Orphanos great latitude in responding with rebuttal experts. However, immediately upon receiving Dr. Orphanos' supplemental rebuttal experts, Mr. Rodgers filed a motion to strike these for being untimely.

25

In applying the *Tallman* factors, we are left with no other conclusion than the trial court abused its discretion in denying Dr. Orphanos' supplemental expert witness disclosure and not allowing Dr. Gehrig to testify to Mr. Rodgers' life expectancy. Under the first factor, the explanation for the late disclosure is essential, however, arguably here life expectancy was always an issue.[16] But, because the remaining three factors weigh in favor of Dr. Orphanos, we conclude the circuit court abused its discretion.

The second *Tallman* factor focuses on the importance of the supplemental expert. Here, Dr. Gehrig was going to testify to the life expectancy of Mr. Rodgers post 2020 stroke. In Dr. Gehrig's opinion, post 2020 stroke, Mr. Rodgers' life expectancy was between five to seven years. Dr. Gehrig's opinion was essential to the total value of damages recoverable by Mr. Rodgers.[17] Not allowing the jury to hear rebuttal expert testimony on conflicting life expectancy left the jury with only Mr. Rodgers' life care planner's opinion of how long he would live.[18]

---

[16] Prior to Mr. Rodgers' 2020 stroke, his life expectancy according to Nurse Taniguchi, Mr. Rodgers' life care planner expert, was twenty-eight years. After Mr. Rodgers' 2020 stroke, his life expectancy, according to Nurse Taniguchi, dropped to 27.3 years. Regardless of whether the 2017 paraplegia caused Mr. Rodgers' 2020 stroke, life expectancy evidence is relevant to determine the appropriate amount of damages.

[17] "In an action for damages for personal injuries a physician who is familiar with life expectancies may testify to the life expectancy of the plaintiff…." Syl. Pt. 1, *Crum v. Ward*, 146 W. Va. 421, 122 S.E.2d 18 (1961).

[18] Notably, this was Dr. Orphanos' only rebuttal expert testimony on life expectancy. Dr. Orphanos' life care planner in her updated report noted specifically that

Third, the potential prejudice that arose from striking Dr. Gehrig from testifying to life expectancy is abundantly clear. Without Dr. Gehrig's testimony that Mr. Rodgers likely only has between five to seven years of life left, the jury was left with only Mr. Rodgers' life care planner's testimony of twenty-seven years. While the amount of prejudice is unclear, it is irrefutable that prejudice occurred. Allowing only one number, twenty years higher than another expert's opinion, certainly had an impact on the jury reaching the amount of damages it did in this case.

Lastly, the fourth *Tallman* factor looks at the availability for a continuance to mitigate any prejudice. Here, Dr. Orphanos asked the court for a continuance in order to allow him more time to rebut Mr. Rodgers' supplemental expert disclosures. However, unclear based on the record why the court did not grant a continuance, the court denied this request and entered the result mentioned above, by striking Dr. Gehrig's testimony. While there is not an abundance of discussion of why a continuance was not proper, the lack of such discussion leads this court to conclude that a continuance would have allowed more time for Dr. Orphanos to rebut Mr. Rodgers' expert testimony. Although the main contention here is the exclusion of Dr. Gehrig's testimony, based on the record, there would have been no harm if the court had granted a continuance.

---

she understood another expert would be opining to life expectancy, so she did not give any opinion on Mr. Rodgers' life expectancy.

Therefore, the record in this case shows that the circuit court abused its discretion in precluding Dr. Gehrig from giving his expert opinion on Mr. Rodgers' life expectancy. Based on this conclusion, this case is remanded for a new trial solely on damages, and the circuit court must allow rebuttal expert life expectancy opinions on behalf of Dr. Orphanos.

### 3. Expert Opinion Testimony

Third, Dr. Orphanos argues that the circuit court abused its discretion by permitting Mr. Rodgers' expert witnesses to render opinions on topics for which they were not qualified. Dr. Orphanos asserts that three of Mr. Rodgers' expert witnesses were unqualified, namely, Nurse Taniguchi, Dr. Feinberg, and Dr. Weidenbaum.

"Whether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its rulings on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused." Syl. Pt. 5, *Mayhorn v. Logan Med. Found.*, 193 W. Va. 42, 44, 454 S.E.2d 87, 89 (1994).[19] Under the MPLA, the following is required for expert witnesses on the standard of care:

> A proposed expert witness may only be found competent to testify if the foundation of his or her testimony is first laid establishing that: (1) The opinion is actually held by the expert

---

[19] "[T]o qualify a witness as an expert on the standard of care, the party offering the witness must establish that the witness has more than a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in the defendant's specialty." *Mayhorn*, 193 W. Va. at 50, 454 S.E.2d at 95.

witness; (2) the opinion can be testified to with reasonable medical probability; (3) the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (4) the expert witness's opinion is grounded on scientifically valid peer-reviewed studies if available; (5) the expert witness maintains a current license to practice medicine with the appropriate licensing authority of any state of the United States…and (6) the expert witness is engaged or qualified in a medical field in which the practitioner has experience and/or training in diagnosis or treating injuries or conditions similar to those of the patient. If the witness meets all of these qualifications and devoted, at the time of the medical injury, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty, or to teaching in his or her medical field or specialty in an accredited university, there shall be a rebuttable presumption that the witness is qualified as an expert. The parties shall have the opportunity to impeach any witness's qualifications as an expert.

W. Va. Code § 55-7B-7(a) (2015); *see also* W. Va. R. Evid. 702(a) ([i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.") Further, the SCAWV has held that "where the proposed expert may be unfamiliar with a specific procedure that is the subject of the action, but otherwise satisfies the MPLA's statutory requirements, the expert is qualified to render an opinion, leaving it to the trier of fact to weigh the expert's credibility." *Tanner v. Raybuck*, 246 W. Va. 361, 372 n.1, 873 S.E.2d 892, 903 n.1 (2022) (Justice Hutchison, concurring) (citations omitted).

29

### i. Nurse Taniguchi

Dr. Orphanos argues that the circuit court abused its discretion in allowing Nurse Taniguchi, an expert life care planner, to render opinions about causation, as she is only a nurse and nurses cannot give causation opinions. He asserts that Nurse Taniguchi was permitted to testify to causation of the 2020 stroke because the court permitted her to read certain portions of Mr. Rodgers' medical records into the record and state that his paraplegia caused or contributed to the 2020 stroke. Again, we disagree.

Notably, Nurse Taniguchi was qualified as an expert in the field of nurse life care planning. During the pre-trial conference Dr. Orphanos filed a motion *in limine* to exclude medical expenses not supported by medical testimony.[20] The circuit court denied

---

[20] Upon review of this case, this Court acknowledges that there is an issue tying causation of Dr. Orphanos' 2017 surgery to Mr. Rodgers' 2020 stroke. During the above referenced motion *in limine* Dr. Orphanos argues that the motion "really had to do more with the 2020 stroke and the medical records associated with it and the future care Nurse Taniguchi is going to be arguing that is related to the 2020 stroke." "An objection to an adverse ruling on a motion *in limine* to bar evidence at trial will preserve the point, even though no objection was made at the time the evidence was offered, unless there has been a significant change in the basis for admitting the evidence." Syl. Pt. 6, *Bennet v. 3 C. Coal*, 180 W. Va. 665, 379 S.E.2d 388 (1989). However, while Dr. Orphanos did file a motion *in limine* arguing there was no causation for the 2020 stroke, here, before this Court, he did not properly preserve that argument. On appeal, Dr. Orphanos fails to argue that there is no causation testimony tying the 2017 surgery to the 2020 stroke. While he does make reference to this argument based on Nurse Taniguchi's assignment of error, he did not brief or argue this point. Here, Dr. Orphanos argues that Nurse Taniguchi should not have been allowed to testify to causation, however, as noted she did the exact opposite, and she stated she could render so such opinion. Thus, because Dr. Orphanos did not properly preserve the issue of no causation opinion testimony for appeal, this court declines to address it. Further, on appeal, based on the failure to properly preserve this issue, causation is no longer an issue for the circuit court below.

this motion, and explicitly stated on the record, "[Nurse Taniguchi] can't give causation testimony."

Nurse Taniguchi updated her life care plan after Mr. Rodgers' stroke in January 2022. However, contrary to Dr. Orphanos' argument, Nurse Taniguchi did not render a medical opinion as to the cause of Mr. Rodgers' stroke.[21] Rather, as a fully qualified nurse and life care planner, she reviewed the diagnosis and condition as reflected in Mr. Rodgers' medical records and used those findings as a basis for calculating her cost estimates. In her report, she outlines the medical records that she used and based her report on.[22] During her testimony, she never gave a causation opinion. Notably, it was explicitly mentioned that she was not a medical expert and could not give any causation opinions. Nurse Taniguchi simply drew pertinent information from Mr. Rodgers' medical records, which she then used to determine the goods and services that would be necessary for Mr. Rodgers' future care.[23]

---

[21] Nurse Taniguchi admitted that as a nurse, she lacks the requisite skill, experience, training, or education needed to opine as to a causal relationship between the 2017 surgery and Mr. Rodgers' 2020 stroke.

[22] Importantly, the medical records themselves were admitted without objection.

[23] At one point during Nurse Taniguchi's testimony, she was asked to explain the meaning of a specific line and comment in Mr. Rodgers' medical records, specifically a statement by Dr. Bansil she relied on. However, she never gave a causation opinion, she simply explained, for clarity, what was meant by Dr. Bansil's record.

Thus, because Nurse Taniguchi did not give any causation opinions, rather just stated what she based her life care plan report on, the circuit court did not abuse its discretion.

### ii. Dr. Feinberg

Dr. Orphanos argues that Dr. Feinberg, Mr. Rodgers' neurology expert, was not qualified to render opinions on the standard of care for neurosurgeons or spine surgeons. Dr. Orphanos asserts that circuit court abused its discretion in permitting Dr. Feinberg to testify because he was not qualified under Rule 702 of the *West Virginia Rules of Evidence* to opine on the standard of care. Once again, we disagree.

Notably, Dr. Feinberg was called to testify to the necessity of using intraoperative monitoring in the type of spinal injuries in this case. He is a board-certified neurologist employed at Pennsylvania Hospital in Pennsylvania. Dr. Feinberg testified that as many as 4,000 spine surgeries are performed every year at the hospital he oversees. The SCAWV expressly held in *Mayhorn* that an expert "is not barred from testifying merely because he or she is not engaged in practice as a specialist in the field about which his or her testimony is offered." *Mayhorn*, 193 W. Va. at 49, 454 S.E.2d at 94. Rather, all that is required "is more than a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in the defendant's specialty." *Id.* at 50, 454 S.E.2d at 95. Thus, based on the record the circuit court did not abuse its discretion in

32

permitting Dr. Feinberg to testify about the importance of the IONM and the standard of care associated therewith.

### iii.  Dr. Weidenbaum

Dr. Orphanos also argues that Dr. Weidenbaum was not qualified to be recognized as an expert in spine surgery. Specifically, Dr. Orphanos asserts that the circuit court abused its discretion in permitting Dr. Weidenbaum to testify because he could not recall when he first performed a surgery involving a Chance fracture, how many surgeries he had performed with Chance fractures, or the last time he performed a Chance fracture surgery. Thus, Dr. Orphanos asserts that the circuit court abused its discretion in permitting Dr. Weidenbaum to be qualified as an expert in spine surgery and testify about Chance fractures. Again, we disagree.

Here, Dr. Weidenbaum possessed extensive qualifications to assess the standard of care for spinal surgeries, including the one in this instance. Following medical school, he underwent a comprehensive training regimen, consisting of a two-year residency in general surgery, followed by a three-year residency in orthopedic surgery, and culminating in a one-year fellowship dedicated to spine surgeries. His expertise is underscored by board certification in this specialized field. Since the completion of his spine surgery fellowship in 1987, he has focused his medical practice solely on spine surgery, contributing his skills and knowledge at Columbia-affiliated hospitals in New York. Based on the record, Mr. Rodgers established that Dr. Weidenbaum has "more than

a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in the defendant's specialty." *Mayhorn*, 193 W. Va. at 50, 454 S.E.2d at 95. Thus, the circuit court did not abuse its discretion in allowing Dr. Weidenbaum to be qualified as an expert and testify on spinal surgery.

### 4. Mr. Rodgers' Mother's Notes

Fourth, Dr. Orphanos argues that the circuit court abused its discretion in precluding him from cross-examining Mr. Rodgers' mother regarding notes that she made while consulting with Mr. Rodgers' treating physician, Dr. Joseph. Dr. Orphanos asserts that because Ms. Rodgers was allowed to refresh her recollection with the notes on direct examination, the notes were admissible under Rule 612 of the West Virginia Rules of Evidence. We disagree.

> Under Rule 612(b) of the West Virginia Rules of Evidence,
>
> An adverse party is entitled to have the writing or object produced at the trial, hearing, or deposition to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony. If the producing party claims that the writing or object includes unrelated matter, the court must examine the writing or object in camera, delete any unrelated portion, and order that the rest be delivered to the adverse party. Any portion deleted over objection must be preserved for the record.

At trial, Mr. Rodgers called his mother, Bonnie Rodgers, to testify. On direct examination, Ms. Rodgers testified that she had written some personal notes while Mr. Rodgers was in the hospital. Ms. Rodgers was then asked, "And would it help you in recalling these events if you were able to look at your notes?" To which she replied, "Probably so." Followed by a second question by counsel, "Just to refresh your recollection?" Mr. Rodgers' counsel then gave those notes to Ms. Rodgers to rely on while testifying.

At the beginning of cross examination, Dr. Orphanos moved her notes into evidence, and they were admitted after a brief side bar, without objection. Then Dr. Orphanos moved to have those notes published to the jury; however, Mr. Rodgers objected, arguing that certain portions were hearsay and permitting testimony about Dr. Joseph's statements violated the court's previous motions *in limine*. The court sustained Mr. Rodgers' objection to the publication of Ms. Rodgers' notes to the jury.[24] Specifically, Dr. Orphanos asserts that he sought to question Ms. Rodgers about a July 19, 2017, conversation she describes in the notes between herself and Dr. Joseph, in which Dr. Joseph explained that he believed Mr. Rodgers' paraplegia was caused by a spinal cord infarct.

---

[24] Based on the court's ruling, the notes were admitted to the jury, however, the exact portion Dr. Orphanos sought to question Ms. Rodgers about was redacted because it went against the court's previous rulings on motions *in limine*.

Importantly, prior to trial, Dr. Orphanos filed a motion *in limine* to prohibit Mr. Rodgers or Mr. Rodgers' family friends from testifying concerning the standard of care or causation, which the court granted with no objection. Even further, the court granted Dr. Orphanos' motion *in limine* to preclude expert opinions not previously disclosed during discovery.

Here, Ms. Rodgers was using her notes to recollect her memory during her testimony. Based on the previous motions *in limine* entered by the Court it was not an abuse of discretion to preclude Dr. Orphanos from cross-examining Ms. Rodgers about a conversation she had with a treating physician, about what he thought was the cause of the paraplegia. Given the rules of evidence, the usage of the notes was appropriate.[25]

### 5. Miscounting of Vertebrae

Fifth, Dr. Orphanos argues that the circuit court abused its discretion by denying his motion *in limine* to preclude evidence that he miscounted vertebral bodies

---

[25] *See* Syl. Pt. 8, *Stephens v. Rakes*, 235 W. Va. 555, 775 S.E.2d 107 (2015)

> "'Once a trial judge rules on a motion in limine, that ruling becomes the law of the case unless modified by a subsequent ruling of the court. A trial court is vested with the exclusive authority to determine when and to what extent an in limine order is to be modified.' Syl. Pt. 4, *Tennant v. Marion Health Care Foundation*, 194 W. Va. 97, 459 S.E.2d 374 (1995)." Syl. Pt. 2, *Adams v. Consol. Rail Corp.*, 214 W. Va. 711, 591 S.E.2d 269 (2003).

during the surgery. Dr. Orphanos asserts that none of Mr. Rodgers' expert witnesses testified in deposition or claimed in their expert opinions that the miscounting of vertebrae was a breach of the standard of care. The circuit court denied Dr. Orphanos' motion after Mr. Rodgers agreed that his experts would not testify that the miscounting of vertebral bodies was "in and of itself a violation of the standard of care." However, Dr. Orphanos argues that based on this denial, at trial Mr. Rodgers during opening and closing was able to improperly persuade the jury by stating that the miscounting of vertebrae was indicative of Dr. Orphanos' negligence and recklessness in this case. Thus, he argues that the jury was misled based on these statements and a new trial is warranted.[26] We disagree; while it is questionable that this testimony should have been excluded, any such error is harmless.

> Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no ways affects the outcome of the trial. Stated conversely, error is prejudicial and ground for reversal only when it affects the final outcome and works adversely to a substantial right of the party assigning it. Obviously, in order for the rule of harmless error to be called into play in support of a judgment, the judgment must be otherwise supportable and will be reversed when there is no evidence to support it. Instances in civil cases in which Rule 103(a) may be applied fall generally into two categories: (1) where the error is so slight that no one could have been mislead

---

[26] *See* Syl. Pt. 9, *Stephens v. Rakes*, 235 W. Va. 555, 775 S.E.2d 107 (2015)

> "Great latitude is allowed [to] counsel in argument of cases, but counsel must keep within the evidence, not make statements calculated to inflame, prejudice or mislead the jury, nor permit or encourage witnesses to make remarks which would have a tendency to inflame, prejudice or mislead the jury." Syl. Pt. 2, State v. Kennedy, 162 W. Va. 244, 249 S.E.2d 188 (1978).

37

> thereby even if the evidence is in substantial conflict; and (2) where the error is substantial, but from the record it is apparent that no impartial jury could have reached any other verdict.

*Reed v. Wimmer*, 195 W. Va. 199, 209, 465 S.E.2d 199, 209 (1995).

At trial, Dr. Weidenbaum was asked by Mr. Rodgers' counsel, "[I]s miscounting the vertebrae a failure or deviation from the standard of care?" And he replied, "No." This testimony was elicited in regard to the IONM, which Mr. Rodgers was asserting that had Dr. Orphanos been using such a device, he would not have placed a screw in the wrong vertebrae. Specifically, Dr. Weidenbaum's testimony was called to show that Dr. Orphanos' failure to use IONM deprived him of real time monitoring and the chance to take immediate corrective action.

Given the significant record in this case, this Court concludes that any such error in regard to this testimony was harmless. Dr. Orphanos was allowed to cross examine Dr. Weidenbaum, and there were numerous other experts who testified to the standard of care. Given the complexity of this case, the amount of testimony on the standard of care in this case, and counsel's ability to cross examine each expert, any such error would be harmless. *See* Syl. Pt. 4, *Grimmett v. Smith*, 238 W. Va. 54, 792 S.E.2d 65 (2016) ("Where, in the trial of an action at trial before a jury, the evidence is conflicting, it is the province of the jury to resolve the conflict, and its verdict thereon will not be disturbed unless believed to be plainly wrong.") (Citation omitted).

### 6. Pie Chart

Sixth, Dr. Orphanos argues that the circuit court abused its discretion by failing to instruct the jury to disregard Mr. Rodgers' demonstrative pie chart during closing arguments. He asserts that at the pre-trial hearing the circuit court granted his motion *in limine* which precluded the parties from making suggestions as to a specific dollar amount that should or should not be awarded relating to non-economic damages.[27] However, during closing arguments, Mr. Rodgers' counsel used a demonstrative pie chart that showed a larger pie slice for non-economic loss than the pie slice for economic loss, but did not include specific dollar amounts for non-economic losses.[28] Therefore, Dr. Orphanos asserts that the circuit court abused its discretion because Mr. Rodgers' emphasis on the size of economic and non-economic loss prejudiced Dr. Orphanos. Again, we disagree.

The SCAWV has stated that making suggestions on non-economic verdict amounts to the jury can result in reversible error. *See* Syl. Pt. 7, in part, *Bennet v. 3 C Coal Co.*, 180 W. Va. 665, 667, 379 S.E.2d 388, 390 (1989) (suggesting a non-economic verdict amount to a jury for non-economic damages "may result in reversible error where the

---

[27] The exact motion was titled "Motion *in Limine* to preclude the suggestion or comparison of the worth of a valuable chattel," which the court granted. However, it was noted in the transcript on the motion that counsel was still allowed to suggest a dollar figure or dollar ranges in closing arguments as permitted by West Virginia law.

[28] Dr. Orphanos objected to the use of the pie chart and requested that the jury be given an instruction to disregard the chart, but the circuit court overruled the objection, explaining that the jury had already been instructed on damages.

verdict is obviously influenced by such statement"); *see also Foster v. Sakhai*, 210 W. Va. 716, 733, 559 S.E.2d 53, 70 (2001) (Davis, J., concurring in part and dissenting in part) ("[s]tating a target amount for a jury to return for noneconomic damages is 'reversible error where the verdict is obviously influenced by such statement.'") (Citation omitted).

While one could argue that presenting a pie chart illustrating damages, particularly slices representing omitted portions, might introduce prejudice, it needs to be shown that this influenced the jury's verdict. In this instance, such a showing is lacking. Dr. Orphanos has not effectively demonstrated how the jury's decision was swayed by this pie chart, particularly considering all of the other evidence presented at trial in regard to non-economic damages.[29] Additionally, the jury instructions provided were sufficient in outlining the criteria and expectations for the jury regarding the determination of non-economic damages. [30]

---

[29] The pie chart contained only those damages which were already produced into evidence.

[30] Notably, the jury instructions provided,

> [a]s it relates to non-economic damages—that is pain and suffering—there is no rule or set method for deciding the amount of these damages. The amount of these damages is left to the discretion of the jury to decide what is fair and just. You must use your judgment to decide a reasonable amount based on the evidence and your common sense. Any such award must be fair and just in the light of the evidence.

Moreover, this argument may be considered moot since the original $7,500,000 awarded by the jury for non-economic damages was later reduced to $750,000 by the circuit court's judgment order. Therefore, the circuit court did not abuse its discretion by not instructing to the jury to disregard the pie chart.

### 7. Cumulative Impact Doctrine

Lastly, Dr. Orphanos argues that the cumulative impact of the aforementioned errors justifies the need for a new trial, as he believes his essential rights to a fair and unbiased trial were violated. He maintains that the combination of these errors rendered the jury's verdict in this case questionable and unreliable. We disagree.

"[T]he cumulative error doctrine may be applied in a civil case when it is apparent that justice requires a reversal of a judgment because the presence of several seemingly inconsequential errors has made any resulting judgment inherently unreliable." *Tennant v. Marion Health Care Foundation, Inc.*, 194 W. Va. 97, 118, 459 S.E.2d 374, 395 (1995). However, in this case we have concluded that there was only one single error made below, therefore, the cumulative error doctrine is inapplicable.

### IV.   CONCLUSION

For the foregoing reasons, this Court affirms the January 20, 2023, order denying Dr. Orphanos' renewed judgment as a matter of law. However, we reverse and remand in part the January 20, 2023, denial of Dr. Orphanos' motion for a new trial, and

41

reverse in part the September 12, 2022, judgment order, for a new trial solely on damages.[31]

On remand the circuit court is required to allow Dr. Gehrig, or a similar defense expert properly noticed, to testify as to the life expectancy of Mr. Rodgers. The only issue on remand is the damages, which shall be adjusted in accordance with Mr. Rodgers' post stroke life expectancy.

Affirmed, in Part, and Reversed and Remanded, in Part.

---

[31] Since the damages will be considered and determined at a later point in time with a new trial, the applicable pre- and post-judgment interest rate, and the calculation of such interest under West Virginia law will need to be adjusted accordingly.